**Loralee VASQUEZ and Charles Vasquez, Plaintiffs–Appellants,**

v.

**Lt. Charles HERNANDEZ, Officers Robert Kierney, Jackie L. Dukes, et al., Defendants–Appellees.**

No. 94–2447.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1995.

Decided July 14, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 12, 1995.

Joseph M. O'Callaghan, John Simonetti (argued), Jennifer A. Schmidt, O'Callaghan & Associates, Chicago, IL, for Loralee Vasquez.

Joseph M. O'Callaghan, Jennifer A. Schmidt, O'Callaghan & Associates, Chicago, IL, for Charles Vasquez.

Edward Hanrahan, Oak Park, IL, for Charles Hernandez, Robert Kierney, Daniel Dimenna.

Stanley H. Jakala, Berwyn, IL, for Jackie L. Dukes.

Robert G. Grossman, Nancy J. Arnold, John C. Doyle, Michael J. Gibbons, Stephen J. Smalling, Michael T. Clarke, Kralovec, Marquard, Doyle & Gibbons, Chicago, IL, for Joseph A. Sirgedas.

Daniel S. Hefter (argued), Caroline K. Vickrey, Martin B. Carroll, Laura A. Harmon, Hefter & Radke, Nicholas Geanopoulos, Chicago, IL, for William Pfieffer, Steven Gratace, Jerry Erjavec, Anthony Iniquez, Howard Hatton, Bruno Jankauskas.

Before BAUER and COFFEY, Circuit Judges, and CRABB, District Judge.*

BAUER, Circuit Judge.

Loralee and Charles Vasquez brought this action under 42 U.S.C. §§ 1983, 1985, against several members of the Cicero Police Department and one member of the Cicero Fire Department. The district court dismissed the section 1985 claim on the pleadings and then granted the defendants' motion for summary judgment on the section 1983 claim. At the heart of the district court's summary judgment decision was its finding that the Vasquezes suffered no constitutional injury. The Vasquezes challenge that finding and appeal the court's decision.

January 27, 1991, known unofficially as Super Bowl Sunday, was a bad day for Loralee Vasquez. While in her home in Cicero, Illinois, she was struck in the ear by a stray bullet. Officer William Pfieffer of the Cicero Police Department was the first police officer to respond to the Vasquezes' call for help. Upon arriving at the Vasquez residence, he inspected the room where the shooting occurred and retrieved a bullet slug from under

* The Honorable Barbara B. Crabb, Chief Judge of the United States District Court for the Western District of Wisconsin, is sitting by designation.

a table. Pfieffer then called his fellow officers for backup.

Among the next wave of officers to arrive at the scene was Sergeant Erjavec. He and Pfieffer proceeded to examine the exterior of the Vasquez home around the window through which the bullet had entered. They discovered one bullet hole in the side of the Vasquezes' garage and two more in the garage door. At that time, Pfieffer was approached by Charles Hernandez, an off-duty Cicero police officer and a neighbor of the Vasquezes. When told about the shooting, Hernandez suggested that the bullets may have been intended for him because he had been having trouble with some gang members.

After completing his search of the premises, which revealed a second gun shell in the Vasquezes' garage, Pfieffer talked to some of the neighbors. Those who were at home admitted to hearing the shots but had seen nothing that might lead police to the identity of the shooter. Pfieffer concluded that the explanation proffered by Sergeant Hernandez was the most likely. Pfieffer returned to the police station where he met with Detectives Howard Hatton and Anthony Iniquez. After briefing the detectives on the shooting, Pfieffer turned over the bullets to them.

Later that evening, Hatton and Iniquez followed up on Pfieffer's preliminary investigation. They interviewed the Vasquezes and inspected the vicinity of the shooting. Then they proceeded to Hernandez's house where they asked him questions about the shooting. Iniquez believed Hernandez to be inebriated. Upon returning from their inquiry, Hatton and Iniquez completed their reports on the shooting. They placed the two shells in an evidence envelope and stored the envelope in Iniquez's desk drawer. Though the case remained officially "open," there was little activity or investigation of the matter by the Cicero police for over four months.

In the interim, the FBI, the Illinois State Police, and the Cook County State's Attorney's Office collaborated to establish a Task Force for purposes of investigating the Vasquez shooting. Their lengthy and detailed inquiry consisted of numerous interviews, exhaustive examination of physical evidence, and use of a sophisticated laser trajectory system designed to replicate the shooting and to locate its source.

The Task Force reached the following conclusion: In the midst of hosting a Super Bowl party at his house, Hernandez and two other off-duty police officers, Joseph Sirgedas and Daniel Dimenna, went out to Hernandez's backyard. In the backyard, a piece of tarp was draped over the door of a children's playhouse. A shooting target was affixed to the tarp with a picture of Saddam Hussein tacked to the center of the target. Witnesses observed Hernandez and two or three other men in the yard. Two of the men were in a combat shooting stance with their arms pointed towards the target. Guests at the party acknowledged hearing gunshots during halftime of the Super Bowl. Ballistics tests of the shells found in the Vasquezes' home confirmed that they could have been fired by either Sirgedas's or DiMenna's nine millimeter gun.

Based on the Task Force's findings, Hernandez, Sirgedas, and DiMenna were charged with violating provisions of the Cicero Code of Ordinances and General Orders. The relevant provisions govern the use and carry of firearms by off-duty police officers. Detective Iniquez was also charged with violating the Cicero Code for his failure to submit the bullets to the property clerk in accordance with prescribed procedure. Hernandez, Sirgedas, and DiMenna were suspended for thirty days. Iniquez received a five-day suspension.

■ Upon the conclusion of the Task Force's investigation, the Vasquezes filed this action. The complaint alleged wrongdoing on the part of two sets of defendants. The first group of defendants is comprised of the various off-duty police officers present at Hernandez's home on the day of the shooting who were either aware of or took part in the backyard shooting.[1] The second group of defendants consists of the on-duty police offi-

---

1. This group consists of Charles Hernandez, Robert Kierney, Jackie Lee Dukes, Daniel Di-Menna, Joseph Sirgedas, and George Janecek.

cers who were involved in the investigation of the shooting and who, according to the complaint, conspired with the first group of defendants to cover up the shooting and impede the investigation.[2] The district court granted all the defendants' motions for summary judgment.[3] We affirm.

■ To successfully withstand a defendant's motion for summary judgment, a plaintiff suing under 42 U.S.C. § 1983 must demonstrate that with respect to the essential elements of the action, there is a genuine dispute as to a material and outcome-determinative fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In deciding on appeal whether a grant of summary judgment was appropriate, we review the evidence and draw reasonable inferences in a light most favorable to the nonmoving party, in this case, the Vasquezes. *Cuddington v. Northern Indiana Public Serv. Co.,* 33 F.3d 813 (7th Cir.1994).

■ Relief under section 1983 is available to a plaintiff who can demonstrate that a person acting under color of state law deprived the plaintiff of a right, privilege, or immunity secured either by the Constitution or by federal law. The first step in analyzing a section 1983 claim is to identify the specific constitutional injury. *Kernats v. O'Sullivan,* 35 F.3d 1171, 1175 (7th Cir.1994). The Vasquezes claim that the defendants' conspiracy of silence deprived them of their constitutional right to seek judicial relief for their injury.

■ The right of individuals to pursue legal redress for claims which have a reasonable basis in law and fact is protected by the First and Fourteenth Amendments. *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 2169, 76 L.Ed.2d 277 (1983); *Bell v. City of Milwau-*

*kee,* 746 F.2d 1205, 1261 (7th Cir.1984). A corollary of this right is that efforts by state actors to impede an individual's access to courts or administrative agencies may provide the basis for a constitutional claim under 42 U.S.C. § 1983. Judicial access must be "adequate, effective, and meaningful," *Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977), and therefore, when police officers conceal or obscure important facts about a crime from its victims rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged. *Bell,* 746 F.2d at 1261; *see also Stone v. City of Chicago,* 738 F.2d 896 (7th Cir.1984); *Ryland v. Shapiro,* 708 F.2d 967 (5th Cir.1983).

*Bell* provides a stark example of how police conduct can infringe upon the right of access. In that case, Daniel Bell, a black man, was shot and killed by a Milwaukee police officer named Thomas Grady. *Bell,* 746 F.2d at 1215. After the shooting, Grady planted a knife in Bell's hand. Grady and his partner, Louis Krause (who had witnessed the incident), then falsely claimed that Grady had shot Bell in self-defense after Bell had threatened Grady with the knife. *Id.* Bell's father filed a wrongful death action against the officers. The officers continued to assert that the shooting was in self-defense. The case first resulted in a mistrial and then, at the urging of the judge, was settled for an amount so meager, Bell's father never cashed the City's check. *Id.* at 1223.

The true circumstances surrounding Bell's death were not revealed until twenty years later when Krause admitted that he and Grady had covered up the truth about Bell's death. Bell's survivors filed a lawsuit which alleged that members of the Milwaukee police force conspired to conceal the true facts

---

2. Comprising the second group of defendants are William Pfieffer, Stephen Gratace, Jerry Erjavec, Anthony Iniquez, Howard Hatton, and Bruno Jankauskas.

3. Because the district court's order failed to grant summary judgment in favor of the defendant Jackie Lee Dukes, we requested that the parties address the issue of whether we had jurisdiction over this appeal. In the interim, the district court issued a *nunc pro tunc* order clarifying its earlier order and granting summary

judgment in Dukes's favor. A district court may issue an order of clarification *nunc pro tunc* after a notice of appeal has been filed without robbing this court of its jurisdiction. *Local 1545, United Mine Workers of America v. Inland Steel Coal Co.,* 876 F.2d 1288, 1291–92 n. 4 (7th Cir.1989). Jurisdiction is, therefore, intact. Nevertheless, the Vasquezes have moved to dismiss Dukes from this appeal, and since there is no objection to such a dismissal, the motion is granted.

of the shooting and that this conspiracy deprived the plaintiffs of their due process rights. Evidence presented at trial indicated that the cover-up was partly a product of racial discrimination amongst the police force. The jury delivered a verdict in the plaintiff's favor. On appeal, we were presented with an argument maintaining that the plaintiffs' right of access to the courts was not a federally protected right. *Id.* at 1260. Defending the jury's verdict, we held that the obstruction of legitimate efforts to vindicate a killing interfered with the due process right of access. *Id.* at 1261. Our holding was motivated in particular by the egregiousness of the police conduct in that case and the prejudice resulting from the excessive delay. *Id.* at 1264.

█ Try as they might, the Vasquezes cannot successfully analogize their predicament to that of the plaintiffs in *Bell.* Though the actions of the defendants in this case are inexcusable, the magnitude of the injury suffered by the Vasquezes is not nearly that sustained by Bell's family. Unlike the twenty-year delay in *Bell,* the actual circumstances surrounding the shooting here were revealed publicly within six months of the incident. And subsequent to the Task Force's investigation, the Vasquezes were granted access to the records of that investigation for use in their own legal action. Hence, the delay, albeit frustrating for the Vasquezes, has not been without some benefit for them. Armed with the information unearthed by the Task Force, they are at a significant advantage in a state tort action against the defendants. The same could not be said in *Bell* where the prejudice to the plaintiffs was extraordinary and extreme.

The Vasquezes contend that this reasoning "suggests the analogy of someone being 'a little bit pregnant.'" Specifically, they maintain that the difference in the delay does not adequately distinguish *Bell* because an act must be either wrongful or not wrongful at the time it was done. In their words, "The passage of time does not alter the character of those acts."

█ We reiterate that by our holding, we do not mean to defend the defendants' actions. The deplorable nature of their conduct is without question. Nevertheless, though the Vasquezes are correct in their assertion that the wrongfulness of an act is judged at the time it is done, the constitutionality of that act may indeed depend on other contextual factors including the passage of time. "Not every act of deception in connection with a judicial proceeding gives rise [to a constitutional action]." *Id.* at 1265. The Vasquezes' constitutional rights were ultimately preserved in this case. The cornerstone of our decision in *Bell* was that the conspiracy had prevented a full and open disclosure of facts crucial to the cause of action, rendering hollow the plaintiffs' right of access. In this case, the cover-up failed to achieve such ends. There are no allegations claiming that the Vasquezes have been prevented from pursuing a tort action in state court or that the value of such an action has been reduced by the cover-up. We agree, therefore, with the district court in holding that the delay caused by the defendants' alleged conspiracy failed to deprive the Vasquezes of their right to access.

Having determined that the Vasquezes failed to sufficiently demonstrate a constitutional injury, we need not address alternative arguments which the defendants offer in defense of the decision below. The district court's holding is, therefore,

AFFIRMED.

CRABB, Chief District Judge, dissenting.

The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship, and must be allowed by each state to the citizens of all other states to the precise extent that it is allowed to its own citizens. Equality of treatment in this respect is not left to depend upon comity between the states, but is granted and protected by the Federal Constitution.

*Chambers v. Baltimore & Ohio Railroad,* 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907) (citations omitted). Because, in my judgment, plaintiffs have stated a case for

conspiracy by state actors that deprived them of their right of access to the courts, I would reverse the district court's grant of summary judgment.

To sustain a cause of action for conspiracy under § 1983, plaintiffs must show that a conspiracy existed and that it deprived them of rights protected by federal law. *Bell v. City of Milwaukee,* 746 F.2d 1205, 1254 (7th Cir.1984). The district court has conceded that there is sufficient evidence of a conspiracy to defeat defendants' motion for summary judgment on this aspect of plaintiff's claim. ("Obviously, certain pieces of evidence point to a possible conspiracy" and given "the Seventh Circuit's directives in allowing circumstantial evidence to paint the conspiratorial picture, we refrain from holding that no conspiracy existed.") With the district court's assumption that there was sufficient evidence of a conspiracy, the only question is whether the Vasquezes' right of access to the courts was abridged by this conspiracy.

The Fourteenth Amendment entitles an individual to a fair opportunity to present a claim where that claim has a reasonable basis in fact or law. *Bell,* 746 F.2d at 1261 (citing *Armstrong v. Manzo,* 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965) and *Bill Johnson's Restaurants, Inc. v. N.L.R.B.,* 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983)). A conspiracy to obstruct an individual's legitimate efforts to seek judicial redress for such a claim interferes with the individual's due process right of access to the courts. *Bell,* 746 F.2d at 1261. Loralee Vasquez had a legitimate tort claim when she was shot in the ear. It follows that a police conspiracy to conceal the facts that form the basis of that claim hinders her from pursuing that claim and thus abridges her right of access to the courts with respect to that claim. The conspiracy in this case prevented Mrs. Vasquez from fully exercising her legal right to redress for at least four months. Before hints of a possible police cover up were revealed, her chose in action against members of the Cicero Police Department was rendered worthless by dint of the conspiracy. That defendants have interfered with plaintiffs' right to access to the courts is evident.

The majority raises the valid concern that the length of the delay was minimal and casts the Vasquezes' plight as insignificant compared to the decades-long cover up that prevented the *Bell* plaintiffs from bringing their suit. The majority's view is that the four-month delay has not prevented the Vasquezes from bringing suit well before the statute of limitations expired and, therefore, should be seen as a deprivation unworthy of constitutional protection. My principal difficulty with this approach is that it provides no guidance on how future courts or litigants might analyze threats to access to the courts posed by a conspiracy of state actors.

Rather than simply concluding that a situation does not compare favorably to *Bell,* or attempting to set temporal boundaries for determining whether a particular delay caused by a conspiracy of state actors passes constitutional muster, I believe that the analysis should encompass a variety of factors, including the length of the delay, the reason for the delay, and the prejudice caused by the delay. These considerations are among those employed in determining whether a defendant's right to a speedy trial has been abridged, *Doggett v. United States,* 505 U.S. 647, 650–56, 112 S.Ct. 2686, 2690–93, 120 L.Ed.2d 520 (1992); *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), or whether one's due process right against oppressive pre-indictment delay has been violated. *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977) *reh'g denied* 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977); *United States v. Canoy,* 38 F.3d 893, 901–02 (7th Cir.1994) (two-pronged inquiry into pre-indictment delay: prejudice and reason for delay).

The analogy between speedy trial or pre-indictment delay analysis and that of the right to access to the courts is not perfect: the concern for protecting a defendant facing incarceration is not present in a civil claim. Still, the comparison is a good one: both situations involve state action that can cause delay in having one's case heard in a timely fashion to the potential prejudice of one's rights. Indeed, in *United States v. Eight Thousand Eight Hundred & Fifty Dollars,*

461 U.S. 555, 562–64, 103 S.Ct. 2005, 2010–12, 76 L.Ed.2d 143 (1983), the Supreme Court deemed the *Barker* speedy trial analysis analogous to the question whether the government's delay in filing a civil forfeiture proceeding violated an individual's due process right to a hearing in a timely fashion. In the present case, there is a close relationship among the causes and effects of the length of the delay, the reasons for the delay, and prejudice.

An examination of the length of the delay reveals that it is sufficient to show significant harm to the plaintiffs. Length of delay is something of a "triggering mechanism" in speedy trial analysis, *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192, and germane to an access to the courts inquiry as well. Although delay itself is not tantamount to prejudice, *Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir.1995), it may raise a presumption of prejudice. *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192. Delay need not be extraordinarily long in order to find a constitutional violation:

> In applying the *Barker* balancing test … [l]ittle can be said on when a delay becomes presumptively improper, for the determination necessarily depends on the facts of the particular case. Our inquiry is the constitutional one of due process: we are not establishing a statute of limitations. Obviously, short delays—*of perhaps a month or so*—need less justification than longer delays.

*Eight Thousand Eight Hundred & Fifty Dollars*, 461 U.S. at 565, 103 S.Ct. at 2012 (emphasis added).

In concluding that the Vasquezes have not been deprived of the right to access to the courts the majority appears to rely on the fact that they were not totally prevented from pursuing a tort action in state court. This reasoning contradicts this court's earlier pronouncements that in order to deny access to the courts, one "need not literally bar the courthouse door or attack plaintiffs' witnesses." *Bell*, 746 F.2d at 1261. The majority acknowledges that where police officers "shield from the public and the victim's family key facts which would form the basis of … claims for redress," the constitutional right of access to the courts is clearly abridged. *Bell*, 746 F.2d at 1261. To require total loss of a cause of action "would encourage police officials to conceal the circumstances related to unlawful [acts] committed under the color of state law and other deprivations of federal rights which Section 1983 was designed to remedy." *Id.* For example, if it were necessary to allege a total loss of a cause of action in order to state a claim of denial of access to the courts, then, in theory, no constitutional violation would result even if the police concealed evidence of a crime until the day before the applicable statute of limitations ran. Such a proposition is unacceptable.

In *Bell*, this court cited approvingly a similar case from the Fifth Circuit, *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir.1983), in which plaintiffs alleged that their daughter had been killed by a local official and that two other officials conspired to hinder police investigation and to cover up facts about the death for nearly a year. *Bell*, 746 F.2d at 1260–61. *Ryland* does not rely on loss of a cause of action for its finding of harm to the plaintiffs. Rather, the court found constitutional harm in the *delay* in the prosecution of an action caused by the actions of state officers.

> Delay haunts the administration of justice. It postpones the rectification of wrong and the vindication of the unjustly accused. It crowds the dockets of the courts, increasing the costs for all litigants, pressuring judges to take short cuts, interfering with the prompt and deliberate disposition of those causes in which all parties are diligent and prepared for trial, and overhanging the entire process with the pall of disorganization and insolubility. But even these are not the worst of what delay does. The most erratic gear in the justice machinery is at the place of factfinding, and possibilities for error multiply rapidly as time elapses between the original facts and its judicial determination.

*Ryland*, 708 F.2d at 974 (quoting *Rheuark v. Shaw*, 628 F.2d 297, 303–04 (5th Cir.1980)). Unlike the twenty-year delay following the initial crime in *Bell*, the cover-up in *Ryland* lasted approximately eleven months. *Id.* at

969. Although this delay was longer than the one at bar, the case illustrates that a finding of constitutional harm does not require a total loss of a cause of action as a consequence of the running of statutes of limitations or a decades-long delay. We cannot assume that a four-month delay in bringing a cause of action in this case would not have resulted in "stale evidence and the fading of material facts in the minds of potential witnesses." *Id.* at 975.

The second consideration, reasons for the delay, argues for finding constitutional injury in this case. In speedy trial analysis, deliberate delay by the government weighs heavily in favor of finding breach of the constitutional right. *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192. Similarly, in pre-indictment delay cases, deliberate delay may impute a violation of due process even if the indictment is brought within the limitations period. *United States v. Gouveia*, 467 U.S. 180, 192, 104 S.Ct. 2292, 2299–300, (1984) (citing *Lovasco*, 431 U.S. at 789–90, 97 S.Ct. at 2048–49). I see no reason to alter this analysis when examining interference with access to the courts caused by a conspiracy of state actors. The *reason* for delay in this particular case could hardly be more egregious. The very nature of a conspiracy makes it difficult for parties from whom evidence or other information is being withheld to determine the extent of their harm. When state actors seek to protect one or more of their own by concealing evidence, hindering investigation or failing to cooperate with the judicial process, it is all the more difficult to discern the full extent of the victim's deprivation. Where, as here, there is evidence of a conspiracy to intentionally impede justice, the showing of prejudice required should be minimal.

The third consideration lies in prejudice to the plaintiffs. The district court made no specific findings on the matter of prejudice. This is unfortunate. I believe that very little prejudice would be necessary in order to state a claim of improper interference with the right of access to the courts where there are credible allegations of a deliberate cover-up by government officials. *See Hessel v. O'Hearn*, 977 F.2d 299, 303–04 (7th Cir.1992) (doctrines such as *de minimis non curat lex*

may be relevant to due process inquiry, but have little if any application to deliberate wrongs). Although the lower court implied that prejudice has been minimized by the FBI's actions, the majority has relied on the fact that, despite the conspiracy, plaintiffs were still able to bring claims against the defendants. As I stated earlier, this is an unsatisfying ground upon which to base a finding of no constitutional harm.

I find disturbing the majority's implication that the efforts of the FBI have blunted the effects of the insidious actions of the police to the point of rendering them harmless. I do agree with the majority's general sentiment that in all likelihood the harm done to the Vasquezes as a result of the conspiracy has been mitigated in part by the serendipitous investigation by the FBI. Nevertheless, the FBI's actions do not absolve the defendants of their egregious behavior or the subsequent cover-up. Although it seems certain that the FBI report on the incident put the Vasquezes in a better position than they would have been after months of an undisclosed police cover-up without such a report, it is not a forgone conclusion that the Vasquezes are better off than they would have been if the police had acted appropriately from the very beginning. Memories fade with time. Witnesses may have responded differently to investigators hired by the Vasquezes shortly after the shooting than they did in the FBI interviews months later. It is possible also that witnesses available soon after the incident became unavailable by the time the FBI arrived on the scene.

Although the amount of harm suffered by the Vasquezes is difficult to determine at this stage, they have suffered some harm from delay alone. If the bullet that struck Mrs. Vasquez did come from the Super Bowl party and the investigation was hindered by the actions of the police, then Mrs. Vasquez's tort claim was rendered useless for months at least in part because of defendants' actions. Improperly denying her information that would have allowed for earlier legal action amounts to harm. This harm is in addition to that possibly suffered as a result of those investigatory burdens discussed earlier and the lack of information plaintiffs *still*

suffer because of the defendants' continuing conspiracy of silence.

Finally, one of the fundamental purposes of § 1983 is deterrence.

> Title 42 U.S.C. § 1983 provides a cause of action against "[e]very person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...." The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.

*Wyatt v. Cole,* 504 U.S. 158, 161, 112 S.Ct. 1827, 1830, 118 L.Ed.2d 504 (1992) (citing *Carey v. Piphus,* 435 U.S. 247, 254–257, 98 S.Ct. 1042, 1047–49, 55 L.Ed.2d 252 (1978)); *Graham v. Sauk Prairie Police Comm'n,* 915 F.2d 1085, 1104 (7th Cir.1990) ("Section 1983 damages are considered to be appropriate as long as those damages generally effectuate the policies underlying § 1983."). Allowing the actions of the federal government to negate the iniquitous behavior of state actors frustrates this deterrent purpose. Even if the harm done to plaintiffs is small, as the majority suggests, the goals of § 1983 urge availability of damages.

Because I believe that the trial court has not properly weighed the interrelated factors of the length of the delay, the reasons for the delay, and resulting prejudice to the plaintiffs, I would remand this case for further findings. Because I find that the Vasquezes' right to access to the courts has been impaired and because allowing the fortuitous actions of an outside entity to absolve the wrongdoer would frustrate the deterrent purposes of § 1983, I respectfully dissent.