OPINION AND ORDER
 

 ARENAS, United States Magistrate Judge.
 

 This matter is before the court on “Defendants’ Motion to Renew Request for Judgment as a Matter of Law After Mistrial and/or Requesting that the Court Alter or Amend the Order Setting the Case for a New Trial.” (Docket No. 322, February 17, 2004.) The defendants have also filed a “Motion Requesting Prompt and Formal Entry of Ruling as to Defendants’ Dispositive [sic] Arguments.” (Docket No. 323.) A motion in response was filed by the plaintiffs on February 24, 2004 (Docket No. 324) to which the defendants replied on March 4, 2004. (Docket No. 326.) After considering the arguments of the parties and for the reasons stated below, defendants’ motions will be DENIED.
 

 I. BACKGROUND
 

 This is a damages action brought by the relatives and heirs of Anthony Hérnandez-González (hereinafter “Anthony”) pursuant to 42 U.S.C. § 1983 and Puerto Rico law. They seek redress for the alleged wrongful death of Anthony by members of the Puer-to Rico Police, San Juan Saturation Unit, in the early morning hours of January 1, 2000 (the Millennium) at the Monte Park Housing Project. The central allegation in the complaint is that on the night in question, defendant police officers entered the premises of Monte Park and upon entry shot indiscriminately at the buildings where residents of all ages celebrated the Millennium. In doing so, they injured Anthony and another youngster, both of whom took refuge in the center of a stairwell of one of the buildings. It is further alleged that acting in concert, some of the police officers entered the stairwell shooting and killing Anthony on the spot. Finally, it is plaintiffs’ general contention that the defendants orchestrated a massive cover-up of the incidents that transpired that night, including but not limited to the planting of an AK-47 rifle that was eventually attributed to Anthony. The plaintiffs also allege liability for the involvement of certain supervisor co-defendants in the alleged cover-up and for the failure to train, monitor and evaluate the performance of some of the officers involved in the Monte Park incident. A claim for libel under Puerto Rico law is also asserted. However, plaintiffs primarily argue that the excessive force used by the defendants violated Anthony’s constitutional rights.
 

 The defendants on the other hand maintain that the officers acted reasonably in the use of deadly force and in responding to a real threat. The intervention at Monte Park was justified, according to the defendants, because in the midst of the celebration, the residents of Monte Park were carrying and shooting firearms which is a felony under Puerto Rico law. The defendants particularly claim that Anthony was one of the individuals that was shooting at them. They have asserted throughout the process that Anthony was carrying, possessing and firing an AK-47 rifle. It is further contended by the defendants that
 
 *CCVI
 
 Anthony refused to obey a halt order given by the officers, which made necessary the use of deadly force.
 

 Trial by jury in the present case was held betwéen November 20, 2003 and January 28, 2004. At the close of plaintiffs’ presentation of their case in chief and again at the close of all the evidence, the defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. (Docket Nos. 269, 294.) Both motions were denied by me from the bench after considering the arguments of the parties in open court and outside the presence of the jury. A mistrial was declared after the jury deadlocked, despite their efforts in trying to reach a unanimous verdict. (Docket No. 316.) Re-trial of this case is set for August 30, 2004. (Docket No. 317.)
 

 II. LEGAL STANDARD
 

 In reviewing defendants’ motion for judgment as a matter of law under Federal Rule of Civil Procedure 50,
 
 [1]
 
 I begin my analysis with bedrock principles. A motion for judgment as a matter of law is appropriate if there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party.
 
 See Richards v. Relentless, Inc.,
 
 341 F.3d 35, 41 (1st Cir.2003) (internal quotations and citations omitted);
 
 see also Guilloty Pérez v. Pierluisi,
 
 339 F.3d 43, 50 (1st Cir.2003). The court must “examine the evidence and all fair inferences in the light most favorable to the plaintiff [and] may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence.”
 
 Katz v. City Metal Co.,
 
 87 F.3d 26, 28 (1st Cir.1996) (quoting
 
 Richmond Steel, Inc. v. P.R. Am. Ins. Co.,
 
 954 F.2d 19, 22 (1st Cir.1992)). If from the evidence presented at trial, fair minded persons could draw different inferences, then the matter is for the jury to resolve and judgment as a matter of law is not appropriate.
 
 Espada v. Lugo,
 
 312 F.3d 1, 2 (1st Cir.2002). But the non-moving party must have presented “ ‘more than a mere scintilla’ of evidence” to survive a motion for judgment as a matter of law and cannot rely on “conjecture or speculation.”
 
 Katz v. City Metal Co.,
 
 87 F.3d at 28 (quoting
 
 Richmond Steel, Inc. v. P.R. Am. Ins. Co.,
 
 954 F.2d at 22).
 

 In addition, it must be noted that a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b)
 
 [2]
 
 may be filed even if a mistrial has been declared.
 
 DeMaine v. Bank One, Akron, N.A.,
 
 904 F.2d 219, 220 (4th Cir.1990). Rule 50(b) particularly provides that such motion may be brought even if
 
 no verdict
 
 was returned. Fed.R.Civ.P. 50(b)(2). Indeed, “[a] jury’s inability to reach a verdict does not necessarily preclude a judgment as a matter of law.”
 
 Headwaters Forest Def. v. County of Humboldt,
 
 240 F.3d 1185, 1197 (9th Cir.2000), ce
 
 rt. granted and vacated on other grounds by
 
 534 U.S. 801, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001);
 
 see also Petit v. City of
 
 
 *CCVII
 

 Chicago,
 
 239 F.Supp.2d 761, 766 (N.D.Ill.2002). Thus, the court must determine whether looking at the evidence presented at trial in the light most favorable to them, there was sufficient evidence adduced by the plaintiffs in support of their claims, or if to the contrary, as a matter of law, judgment should be entered in favor of the defendants.
 
 DeMaine v. Bank One, Akron, N.A.,
 
 904 F.2d at 220.
 

 III. ANALYSIS
 

 In their renewed motion for judgment as a matter of law, the defendants argue
 
 inter alia
 
 that they are entitled to qualified immunity as to the supervisory liability and failure to train claims. They also claim entitlement to said defense with respect to the unreasonable use of force and cover-up causes of action. Finally, the defendants maintain that as a matter of law, they are entitled to judgment on the claims brought under Puerto Rico law. They request a “prompt and formal” ruling.
 

 The plaintiffs oppose defendants’ motion arguing that it was untimely filed since it was filed over 10 days after the jury in the present case was discharged. In addition, the plaintiffs argue that co-defendants’ motion is akin to a motion for summary judgment, without compliance with the rules established in this district for summary disposition. According to them, defendants’ motion is, in essence, an attempt to have the court determine that the plaintiffs have failed to submit sufficient evidence to have the case tried before a jury. It is asserted that defendants are asking the court to review the evidence in the light most favorable to them and accept as true their version of the facts. The plaintiffs maintain that such is an incorrect statement of the proper standard of review under Federal Rule of Civil Procedure 50.
 

 I will address the arguments presented by the defendants in support of their motion in the order they are presented. I will note as a preliminary matter, however, that the plaintiffs mistakenly assert that defendants’ motion was untimely filed. The jury in this case was discharged on January 28, 2004. (Docket No. 316.) The discharge was docketed, by way of minute entry, on February 2, 2004. Considering that February 16, 2004 was a legal holiday, defendants’ motion was due on or before February 17, 2004 (computing the 10 days without intervening weekends and legal holidays), that is, the actual date in which the defendants filed their motion. (Docket No. 322.) Accordingly, it was timely brought.
 

 A.
 
 Qualified Immunity
 

 The argument advanced by the defendants is that the officers’ conduct in the present case was objectively reasonable in light of the situation presented to them at Monte Park the night in question. They claim that even assuming that Anthony was deprived of his constitutional rights and that said rights were clearly established, the conduct of the defendant police officers was objectively reasonable inasmuch as they could not have believed that they were violating such clearly established constitutional rights.
 

 The qualified immunity defense recognizes “an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law.”
 
 Mitchell v. Forsyth,
 
 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In the First Circuit, the analysis of the qualified immunity defense is comprised of three separate inquiries: (1) the court must ask “whether plaintiff has alleged the violation of a constitutional right[;]” (2) “[i]f so, then [the court must inquire] whether the contours
 
 *CCVIII
 
 of [such] right[s] were [clearly] established at the time of the alleged violation[;]” and (3)“whether an objectively reasonable official would have believe that the action taken or omitted violated that right.”
 
 Acevedo-García v. Vera-Monroig,
 
 351 F.3d 547, 563-64 (1st Cir.2003) (quoting
 
 Hatch v. Dep’t of Children, Youth & Their Families,
 
 274 F.3d 12, 20 (1st Cir.2001)). Qualified immunity protects “all but the plainly incompetent or those who knowingly violate the law.”
 
 Malley v. Briggs,
 
 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
 

 1. Plaintiffs’ Supervisory and Failure to Train Claims:
 

 With respect to plaintiffs’ supervisory liability and failure to train claims, the defendants argue that plaintiffs have failed to establish a causal link between the death of Anthony and any action, directives or orders given by co-defendants Agustín Cartagena, Lillian Rivera, Juan Vargas and Valentín Vázquez. Specifically, the defendants argue that no causal link has been established between Vargas’ history of administrative complaints and the actions of the officers on January 1, 2000, since Vargas arrived at the scene after the shootings had taken place.
 

 It is firmly settled law that liability under section 1983 cannot be predicated upon a theory of
 
 respondeat superior. Gutiérrez-Rodríguez v. Cartagena,
 
 882 F.2d 553, 562 (1st Cir.1989). To the contrary, a supervisor must be found liable for his or her own acts of omissions.
 
 Maldonado-Denis v. Castillo-Rodríguez,
 
 23 F.3d 576,
 
 582 (1st
 
 Cir.1994) (citation omitted). Liability is imposed if there is a showing that the “supervisor’s conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others.”
 
 Barreto-Rivera v. Medina-Vargas,
 
 168 F.3d 42, 48 (1st Cir.1999) (quoting
 
 Gutíerrez-Rodríguez v. Cartagena,
 
 882 F.2d at 562). Actual knowledge of the offending behavior is not required, only that the supervisor “would have known of it but for his deliberate indifference or willful blindness.”
 
 Camilo-Robles v. Hoyos,
 
 151 F.3d 1, 7 (lrsr Cir.1998) (quoting
 
 Maldonado-Denis v. Castillo-Rodríguez,
 
 23 F.3d at 582). If such showing is made, then the supervisor is responsible for the foreseeable consequences of such conduct if he had the power and authority to alleviate it.
 
 Maldonado-Denis v. Castillo-Rodríguez,
 
 23 F.3d at 582.
 

 Finally, there must also be an “ ‘affirmative link’ between the street-level misconduct and the action, or inaction, of supervisory officials.”
 
 Gutíerrez-Rodríguez v. Cartagena,
 
 882 F.2d at 562 (quoting
 
 Woodley v. Town of Nantucket,
 
 645 F.Supp. 1365, 1372 (D.Mass.1986)) (quoting
 
 Rizzo v. Goode,
 
 423 U.S. 362, 371, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)).
 

 This causation requirement can be satisfied even if the supervisor did not participate directly in the conduct that violated a citizen’s rights; for example, a sufficient causal nexus may be found if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct. Consequently, deliberate indifference to violations of constitutional rights can forge the necessary linkage between the acts or omissions of supervisory personnel and the misconduct of their subordinates.
 

 Maldonado-Denis v. Castillo-Rodríguez,
 
 23 F.3d at 582 (citations omitted).
 

 The evidence submitted at trial established that at the time of the incident in Monte Park, co-defendant Cartagena was the area commander for San Juan; co-defendant Rivera was the saturation unit director; and Sergeant Juan Vargas was one of the supervisors of the unit. The
 
 *CCIX
 
 latter was assigned by Cartagena to the saturation unit back in 1996. (Tr. 10th day of Jury Trial, Docket No. 295, at 39.) At issue particularly is the supervision by Vargas of the officers involved in the shooting at Monte Park and his disciplinary record. The plaintiffs attempt to impose supervisory liability on co-defendants Cartagena, Rivera and Vázquez for their failure to identify Vargas’ history and for allowing an officer with Vargas’ proclivities to remain in charge of a high impact unit such as saturation. The defendants contend that, as a matter of law, the plaintiffs failed to show an affirmative link between any act or omission by Vargas’ supervisors and the death of Anthony. According to defendants, there was no evidence submitted tending to show that the officers entering Monte Park acted under the instructions of Sergeant Vargas; therefore, the above co-defendants are entitled to qualified immunity. I disagree.
 

 Lou Reiter, plaintiffs’ expert on police practices, discipline, supervision and field tactics, and whose qualifications are not objected to by the defendants, testified at trial about the disciplinary procedures for police officers in Puerto Rico. Reiter specifically testified about general order ST-14, which relates to administrative investigations inside the police department. (Docket No. 295, at 40.) Order 87-14 is divided in two parts. The first part addresses the procedure for investigating citizen-initiated complaints.
 
 (Id.)
 
 The second part refers to a supervisor’s obligation to search out and check the administrative complaint history of all of his or her employees.
 
 (Id.)
 
 According to Reiter, the complaint history of an officer, particularly if that officer gets a lot of complaints, must be evaluated as a pattern of conduct. (Docket No. 295, at 16.) Reiter also testified about general order 90-5.
 
 (Id.
 
 at 47.) Such general order addresses the issue of repetitive conduct. So if an officer is found to have a number of complaints, he or she would be referred to a special training course in an attempt to remedy such officer’s disciplinary problems.
 
 (Id.)
 
 The program is described as a betterment course and supervisors are required to identify the officers that, based on their record of administrative complaints and other problems, must be sent to such program.
 
 (Id.
 
 at 47-48.)
 

 Reiter was specifically presented with Exhibit 62, which is a request for admissions that the court ordered be deemed admitted. Such exhibit contains a number of facts regarding Sergeant Vargas’ complaint history during his career since 1977.
 
 (Id.
 
 at 50.) The exhibit reveals at least 23 administrative investigations against Vargas in equal number of years.
 
 (Id.)
 
 Twelve of those were presented subsequent to the enactment of orders 87-14 and 90-5.
 
 (Id.)
 
 Vargas’ history of complaints include sanctions that ranged from simple reprimands up to 30-day suspensions.
 
 (Id.
 
 at 51.) Most of this disciplinary sanctions were imposed after being reduced from expulsion recommendations or large suspension recommendations such as five months.
 
 (Id.)
 
 Examples of the conduct alleged in these complaints involve some sort of inappropriate use of a weapon by an officer or Vargas himself, failure to intervene in assaults committed by his subordinates and failure to investigate and turn over evidence in a shooting incident. (Docket No. 295, at 50-51.)
 

 Reiter identified a particularly egregious complaint which is referred to in the record as the Lisette Apartments case or incident.
 
 (Id.
 
 at 53.) Allegedly, in 1993 Vargas and another officer encountered some females during a traffic stop, followed them out of their area and went to their apartment to have coffee.
 
 (Id.)
 
 Vargas left his squad car unlocked and when he came back from said apartment he
 
 *CCX
 
 found that his hat had been stolen from the car.
 
 (Id.)
 
 He apparently became irate and there were allegations of Vargas challenging young people in the area with his firearm drawn and hitting one of them.
 
 (Id.)
 
 When an off-duty officer intervened to inquire as to the reasons Vargas was hassling the youngsters, Vargas fired his weapon at the off-duty officer.
 
 (Id.)
 
 Allegedly, Vargas twice refused to testify at hearings regarding this incident. (Id.) Initially, the administrative investigations division of the Puerto Rico Police recommended a three-month suspension against Vargas, but in 1995, the superintendent recommended that Vargas be expelled. (Id. at 54.) Nevertheless, after a hearing, Vargas was sanctioned with a 28-days suspension. He was also the subject of criminal charges, but was never prosecuted. (Id) Even though Vargas was referred to take betterment courses under order 90-5, the evidence indicates that he twice failed to attend. (Id. at 56.) Nothing appears to suggest that he was ever sanctioned for such failure according to Reiter. (Id. at 56-57).
 

 With respect to Lillian Rivera, Reiter explained that it was her obligation under order 87-14 to research her immediate subordinate’s complaint history. (Docket No. 295, at 57.) She never did so. In Reiter’s opinion, she did not comply with the requirements of order 87-14 because had she sought out the disciplinary records of Vargas, she would had discovered the number of complaints against him. (Id. at 57-59.) Pursuant to order 87-14, there are a number of actions that Rivera should have taken. (Id. at 59.) She could have sent Vargas to the three-day professional betterment program; she could have recommended that Vargas be transferred out of the saturation unit which is a very high risk unit; or she could have just assigned Vargas to administrative positions within the same unit such as “retén” or other in which he did not have to go out in the field. (Id. at 60.)
 

 With respect to Colonel Cartagena, Reiter testified that as Area Commander, he was the final disciplinarian. (Id at 61.) Cartagena had a myriad of options regarding the professional betterment and fitness-for-duty of Sergeant Vargas. (Id at 61-62.) He was particularly on notice about Vargas’ administrative record since he even intervened in at least three of the complaints. (Id. at 62.) He was in fact the person who assigned Vargas to the Saturation unit. (Id) Reiter stated that among other things, Cartagena failed to make sure that Vargas attended the trainings recommended for him as part of some disciplinary investigations.
 
 (Id.)
 

 In general, Reiter expressed an opinion as to Vargas’ fitness to be the supervisor of a sensitive unit such as saturation. His opinion is that a person who “flies off the handle,” who “can’t control their [sic] emotions,” who “abuses citizens” and who “is not truthful and honest,” should not be in charge of an unit like saturation. (Docket No. 295, at 63.) Specially since subordinates tend to emulate their supervisors in an unit as close as that one.
 
 (Id)
 

 There is conflicting evidence with respect to whether the officers involved in Anthony’s death acted upon instructions by Sergeant Vargas. Even though it is undisputed that Vargas was their immediate supervisor, there is a dispute as to whether the agents entered Monte Park on their own initiative — namely after witnessing a felony being committed as claimed — or upon the instructions of their immediate supervisor which would satisfy the “affirmative link” requirement. For instance, as to the night in question, Reiter testified that after going through the depositions of some of the officers, it appears that they were not to go into the housing
 
 *CCXI
 
 projects without a supervisor’s approval.
 
 {Id.
 
 at 70.) In contrast, there is the testimony of co-defendant Jaime Ramos, who averred that he made the decision to enter Monte Park by himself, that no one gave him instructions. (Tr. 4th day of Jury Trial, Docket No. 270, at 36.) The only communication he had with Vargas was to inform him of their location prior to arriving at Cafeto Street.
 
 {See id.
 
 at 31-36.) However, he later admitted, after being confronted with his deposition testimony that the decision to go in was made on the basis of a 10-50 received from inside Monte Park. (Docket No. 270, at 37.) Ramos’ testimony conflict with that of Sergio López and José Maldonado. In his testimony, agent López states how the officers were instructed to gather at the Pep Boys on 65th Infantry Avenue. (Tr. 6th day of Jury Trial, Docket No. 275, at 102.) Ló-pez also testified that Vargas met with the agents at Pep Boys to prepare to go into Monte Park.
 
 {Id.
 
 at 103.) An initial intervention at Monte Park took about 45 minutes and the officers used the main entrance and a pedestrian entrance to enter the housing project.
 
 {Id.
 
 at 103-04.) They were ordered to meet again at the Pep Boys where they were met by Sergeants Vargas and Vázquez.
 
 {Id.
 
 at 104.) López was asked “what plans, if any, were made at the Pep Boys for returning to Monte Park?”
 
 {Id.
 
 at 105.) The answer given by López was “[t]o go back later.”
 
 {Id.)
 
 López also stated that it was Vargas who gave such instruction.
 
 (Id.)
 
 Finally, the testimony of José Maldonado also established that the agents were in communication with Vargas and Vázquez as they were going in Monte Park. (Tr. 7th day of Jury Trial, Docket No. 278, at 80-83.)
 

 Against this backdrop, it is clear that a factual dispute, generated after conflicting evidence was presented at trial, precludes a finding as a matter of law that the co-defendant officers did not act upon orders and directives made specifically by Sergeant Vargas. It was up to the trier of fact, in this case the jury, to weigh the evidence and make reasonable inferences regarding said issue. Because sufficient evidence was presented by both sides, the court is in no position to find as a matter of law that the plaintiffs completely failed to show an “affirmative link” between the failure of co-defendants Cartagena, Rivera and Vázquez to take measures regarding Vargas’ complaint history and the depravation, if any, of Anthony Hernández’ constitutional rights. When looked at in the light most favorable to the non-moving party, here the plaintiffs, the evidence was sufficient to establish that the omissions of Vargas’ supervisors in taking adequate disciplinary measures and in preventing him from supervising a high impact unit like saturation, are affirmatively linked to the events of January 1, 2000, in which the officers acted on Vargas’ instructions and orders. It was for the jury to weigh the conflicting evidence and therefore, in the face of such factual dispute, a qualified immunity finding is precluded. Defendants’ motion for judgment as a matter of law is accordingly DENIED.
 

 2. Excessive Use of Force:
 

 Next is co-defendants’ contention that they are entitled to judgment as a matter of law on plaintiffs’ excessive use of force claim. They specifically argue that the officers are all entitled to qualified immunity because it was reasonable for them, under the circumstances, to use lethal force against a fleeing individual. While the defendants maintain that it is undisputed that Anthony was carrying an AK-47 and that he was firing such weapon against the officers, they also argue that the officers acted reasonably in using deadly force after Anthony disobeyed an order to stop even if the court considers
 
 *CCXII
 
 that he was not wielding the rifle. The defendants also rely on Puerto Rico law which makes it a felony to carry and shoot firearms in the manner Monte Park residents were allegedly carrying and shooting the long weapons. It is defendants’ position that they were compelled to intervene in Monte Park, following Puerto Rico law, after witnessing the commission of a crime, thus acting reasonably under the circumstances.
 

 Excessive force cases such as this are analyzed under the Fourth Amendment’s “objective reasonableness standard” and not under substantive due process principles.
 
 Saucier v. Katz,
 
 533 U.S. 194, 204, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citing
 
 Graham v. Connor,
 
 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).
 

 Because police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer’s belief as to the appropriate level of force should be judged from that on-scene perspective. We set out a test that cautioned against the “20/20 vision of hindsight” in favor of deference to the judgment of reasonable officers on the scene.
 

 Saucier v. Katz,
 
 533 U.S. at 205, 121 S.Ct. 2151 (citations omitted). The court must pay careful attention to the particular facts of each case and consider the following: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he or she is resisting arrest or attempting to evade arrest by flight.
 
 Id.
 
 (quoting
 
 Graham v. Connor,
 
 490 U.S. at 396, 109 S.Ct. 1865).
 

 Consequently, in excessive force cases qualified immunity has a further dimension.
 
 Saucier v. Katz,
 
 533 U.S. at 205, 121 S.Ct. 2151. The Court explained that
 

 The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.
 

 Id.
 
 In any event, excessive force claims must be evaluated for the objective reasonableness considering the information the officers had at the time.
 
 Id.
 
 at 207, 121 S.Ct. 2151.
 

 In this case the analysis of defendants’ qualified immunity defense turns upon the issue of whether Anthony was in fact carrying and firing an AK-47. The three factors set forth in
 
 Saucier v. Katz,
 
 involve a determination of whether Anthony was in possession of the rifle. For example the severity of the crime factor presupposes the commission of a crime. If Anthony was not carrying a firearm, no crime was being committed. In addition, the determination of whether Anthony was in possession of the rifle also hinges on the officers’ belief that he posed a threat to the officers or to others. Finally, the issue also relates to the officers’ belief that the suspect was attempting to evade arrest by flight, or simply running away from an undoubtedly chaotic situation.
 

 Defendants’ argument that the evidence is undisputed with respect to the fact that Anthony was carrying the AK-47 is wrong and based on a failure to appreciate the evidence presented at trial. Nothing can be further from reality. Although the de
 
 *CCXIII
 
 fendants rely on the testimony of Héctor Luis Román for their assertion that the issue is undisputed, they completely disregard the testimonies of witnesses like Jorge Otero, Margarita López, Sergio Ló-pez and Noemi Rodriguez among others. In general terms, these witnesses testified that Anthony was not carrying an AK-47 or at least that they did not see such a weapon in Anthony’s hands. The jury was free to credit their testimonies. Nevertheless, the defendants seem to suggest that the trier of fact was required to credit without questioning the testimonies of the officers and that of Héctor Luis Román and take as a proven, undisputed fact that Anthony had an AK-47. In doing so, they misconstrued the record and ignored the standard of review. The court must consider the evidence in light most favorable to the plaintiffs and not the other way around. Consequently, given the conflicting evidence presented at trial, I find that there is a factual dispute regarding the reasonableness of the officers actions which in turn depends on the contested factual question of whether Anthony was carrying an AK-47. The defendants are, therefore, not entitled to the qualified immunity defense. As to this issue, their motion for judgment as a matter of law is also DENIED.
 

 8. The Cover-up and Libel Claims:
 

 With respect to plaintiffs’ cover-up claim, the defendants argue that they are entitled to qualified immunity and consequently to judgment as a matter of law. The crux of their contention is that to be actionable under section 1983, the alleged cover-up must have impeded plaintiffs from exercising the right to file a complaint or prosecute the same. In other words, according to defendants, the coverup claim cannot proceed since nothing has impeded plaintiffs’ ability to seek redress for their wrongful death and other constitutional claims. Additionally, defendants maintain that plaintiffs’ cover-up claim is grounded on the assertion that an AK-47 was planted but that even if true, such conduct did not prevent the plaintiffs from bringing the present action.
 

 Furthermore, in regards to plaintiffs’ libel action brought under the provisions of article 1802 of the Puerto Rico Civil Code, 31 P.R. Laws. Ann § 5141, the defendants contend that they had no control over the publications in the newspaper allegedly depicting Anthony in a negative light and implying that he had violated the law. Additionally, the defendants claim that plaintiffs failed to prove that the publications were negligent and that the damages caused by said publications, if any, are attributable to the defendants.
 

 Through the process, the plaintiffs have maintained that their cover-up and libel claims are intrinsically related. In addition, they argue that, even if the cover-up claim cannot be advanced as a federal claim under section 1983, article 1802 is broad enough to cover the misconduct of the police with regards to intentional manipulation of the scene, the planting of the AK-47 and defamation of the decedent’s character.
 

 The right to access to court to redress constitutional violation is rooted on the Due Process clause of the Fourteenth Amendment which in turn “assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights.”
 
 Wolff v. McDonnell,
 
 418 U.S. 539, 579, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Indeed, individuals have a right of access to the courts which must be adequate, effective and meaningful.
 
 See, e.g., Bounds v. Smith,
 
 430 U.S. 817, 822, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). To this end, it has been held that a conspiracy to
 
 *CCXIV
 
 cover-up and conceal facts is actionable under section 1983.
 
 See Bell v. Milwaukee,
 
 746 F.2d 1205, 1261 (7th Cir.1984). “[A]n intentional effort by police or other government officials to shield a dead victim’s family from key facts which would form the basis of his survivors’ claims for redress violates the constitutional rights of those survivors.”
 
 Gonsalves v. City of New Bedford,
 
 939 F.Supp. 921, 925 (D.Mass.1996).
 

 In the First Circuit however, the question has not been clearly decided. In
 
 Landrigan v. City of Warwick,
 
 628 F.2d 736, 742 (1st Cir.1980), the court assumed without deciding that a section 1983 action alleging a conspiracy to cover-up acts that deprive the right to seek redress for the unconstitutional use of force may amount to a depravation of federally protected rights. However, some of the circuits that have addressed the issue make clear that the cover-up must prevent the plaintiffs from recovering in the lawsuit where the cover-up claim is brought.
 
 See, e.g., Vásquez v. Hernandez,
 
 60 F.3d 325, 329 (7th Cir.1995) (opining that the plaintiffs were not deprived of their constitutional right to access because the alleged conspiracy did
 

 not prevent full and complete disclosure of the facts giving rise to their section 1983 action);
 
 Wilson v. Meeks,
 
 52 F.3d 1547, 1557 (10th Cir.1995) (citing
 
 Foster v. City of Lake Jackson,
 
 28 F.3d 425, 429-31 (5th Cir.1994)) (limiting cover-up actions to conduct that interferes with the right to institute suit);
 
 Karim-Fanahi v. Los Angeles Police Dep't,
 
 839 F.2d 621, 625 (9th Cir.1988) (holding that a cover-up claim is mooted if a plaintiff succeeds in recovering for his or her police misconduct claims and dismissing the cover-up claim without prejudice to seeking subsequent redress in the eventuality plaintiff was unsuccessful);
 
 Gonsalves v. City of New Bedford,
 
 939 F.Supp. at 925-26 (“Section 1983 provides a remedy for such constitutional violations if the defendants’ actions were [causally] connected to a plaintiffs failure to succeed in her lawsuit.”).
 

 In view of the above, it is at least questionable that the plaintiffs could maintain a section 1983 cause of action for depravation of federally protected rights under the premise of cover-up. However, the issue not being completely settled, I find that it is premature to find as a matter of law that plaintiffs’ allegations are simply not actionable, specially in light of impending re-trial, and in light of state law, as it will be discussed below. After all,
 

 [i]n a very real sense [an] officer’s corrupt scheme can scar the citizen as much as would ever be possible with the fist or billyclub. Such conduct is especially egregious when one in a supervisory position encourages those who would look to him for guidance to participate in such a lawless plan.
 

 Bibbo v. Mulhern,
 
 621 F.Supp. 1018, 1026 (D.Mass.1985). Furthermore, it has already being stated that the presence of conflicting evidence which is for the jury to weigh, precludes a finding for either party in material issues such as the planting of the AK-47. Manipulation of the crime scene and deficiencies in its preservation is another area where findings as a matter of law are precluded. As such, the court will preserve plaintiffs’ claims for now.
 

 In addition, under Puerto Rico law, a cause of action for defamation and libel emanates from three separate sources.
 
 Aponte v. Calderón,
 
 284 F.3d 184, 197 (1st Cir.),
 
 cert. denied,
 
 537 U.S. 886, 123 S.Ct. 128, 154 L.Ed.2d 145 (2002) (citing
 
 Giménez Álvarez v. Silén Maldonado,
 
 131 D.P.R. 91, 97-98 (1992)). They are Article II, Section 8 of the Puerto Rico
 
 *CCXV
 
 Constitution
 
 [3]
 
 ; the Libel and Slander Act of 1902
 
 [4]
 
 ; and article 1802 of the Puerto Rico Civil Code
 
 [5]
 
 .
 
 Id.
 

 The Supreme Court of Puerto Rico has recognized two causes of action in damages for defamation. First is the one established in the Libel and Slander Act of 1902 and the second one is the one derived from article 1802 for damages sustained after the publication of an intentional or negligent defamatory expression.
 
 Ojeda v. El Vocero de Puerto Rico,
 
 137 D.P.R. 315, 326 (1994) (translation ours). Nevertheless, the Court has stated that the Libel and Slander Act of 1902 has been substantially modified, conditioning its validity to the constitutional precepts of freedom of speech and press and its interpretative jurisprudence.
 
 Acevedo Santiago v. Western Digital Caribe, Inc.,
 
 140 D.P.R. 452, 460, 1996 WL 940813 (1996) (citing
 
 Villanueva v. Hernández Class,
 
 128 D.P.R. 618, 640-41, 1991 WL 735303 (1991)). The defamation cause of action is according to the Puerto Rico Supreme Court an action that as a general rule must now be resolved under the normativeness of a traditional damages action for intentional torts or negligence.
 
 Ojeda v. El Vocero de Puerto Rico,
 
 137 D.P.R. at 328. To prevail on a defamation action under Puerto Rico law, a plaintiff must therefore prove: (1) that the information is false; (2) that he or she suffered real damages; and (3) that in the case of a private figure, the publication was negligently made.
 
 Ayala-Gerena v. Bristol Myers-Squibb Co.,
 
 95 F.3d 86, 98 (1st Cir.1996);
 
 see also Rivera Rodríguez v. First Bank Puerto Rico,
 
 184 F.Supp.2d 162, 166 (D.P.R.2002).
 

 On the other hand, article 1802 provides one of the most fundamental principles of Puerto Rico jurisprudence
 

 —that of the Aquilian liability for personal acts — [that] all damage, whether material or moral, gives rise to reparation if three requirements are met: first, proof of the reality of the damage suffered; second, a causal relation between the damage and the action or omission of another person; and third, said act or omission is negligent or wrongful.
 

 Sociedad de Gananciales v. El Vocero de Puerto Rico, Inc.,
 
 135 D.P.R. 122, 134 (1994), P.R. Offic. Trans. No. 91-414, slip op. at 10 (citations omitted). The concept of fault in article 1802 “is infinitely embracing, as ample and embracing as human conduct is[,]”
 
 Santiago v. Group Brasil, Inc.,
 
 830 F.2d 413, 415 (1st Cir.1987);
 
 see also Santini Rivera v. Serv. Air, Inc.,
 
 137 D.P.R. 1, 8 (1994), and it includes “every kind of human trespass in the legal as well as the moral order.”
 
 Sociedad de Gananciales v. El Vocero de Puerto Rico, Inc.,
 
 135 D.P.R. at 134. “This principle generally rules redress for a wrongful act, even when the wrongful act clashes against the interest or rights guaranteed by the Constitution or by civil rights legislation.”
 
 Bonilla v. Chardón,
 
 118 D.P.R. 599, 601 (1987), 18 P.R. Offic. Trans. 696, 709-10 (citations omitted).
 

 Accordingly, the court must examine whether the publication of the newspaper photographs constitute libel so as to be actionable under Puerto Rico law. Pursuant to 32 P.R. Laws Ann. § 3142, libel is defined as
 

 
 *CCXVI
 
 the malicious defamation of a person made public by writing, printing, sign, picture, representation, effigy, or other mechanical mode of publication tending to subject him to public hatred or contempt, or to deprive him of the benefit of public confidence and social intercourse, or to injure him in his business, or in any other way to throw discredit, contempt or dishonor upon him, or malicious defamation made public as aforesaid, designed to blacken or vilify the memory of one who is dead and tending to scandalize or provoke his surviving relatives or friends.
 

 32 P.R. Laws Ann. § 3142.
 

 Furthermore, the Puerto Rico Supreme Court has held that publications in which the commission of a crime is imputed are considered libelous per
 
 se. See Pérez-Rosado v. El Vocero de Puerto Rico,
 
 149 D.P.R. 427 (1999).
 

 In this case, the newspaper photographs present Anthony lying on the floor with the AK-47 right next to it.
 
 (See
 
 Plaintiffs’ Ex. 35, Ex. 35A.) There are allegations that Anthony was carrying the AK-47 which was removed from his side and then placed back next to him for the sole purpose of taking the photographs. However, as explained above, there is also the conflicting allegation that the rifle was planted by the co-defendants. The jury was entitled to credit one of the two controverted positions and determine, assuming they found co-defendants planted the rifle, that the publication placed Anthony in a false light, discrediting his honor and reputation. Even though they claim not to have control over the publication, they may be responsible for depicting Anthony as if he had committed a crime. By way of example, the publication of a defamatory newspaper photograph is similar to that of an article quoting a defamatory statement. The statement would be attributed to the declarant not to the newspaper. As such, if the defendants were found to have planted the AK-47 to either intentionally or negligently portray that the decedent was engaged in the commission of criminal acts, the trier of fact was entitled to infer that the defamatory expression was attributable to co-defendants’ depiction. That is an inference that the jury was entitled to make and for which sufficient evidence had been presented. Therefore, in the face of article 1802’s broad characterization of the concept of fault and its correlation with a libel cause of action, it necessarily follows that the defendants are not entitled to judgment as a matter of law given the evidence presented at trial.
 

 IV. CONCLUSION
 

 The court needs to go no further. Having reviewed the complete record and the positions of the parties, I find that there was conflicting evidence precluding defendants’ attempt to sever plaintiffs’ case with one swing of the qualified immunity axe. The reasonableness of the defendants’ conduct depends on the determination by the jury of a number of factual disputes regarding which the plaintiffs have submitted sufficient evidence. As the record stands, defendants motion for judgment as a matter of law after mistrial must be and is hereby DENIED. Defendants’ motion to alter or amend the order setting the case for a new trial is also DENIED.
 

 SO ORDERED.
 

 [1]
 

 . If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party.... Fed.R.Civ.P. 50(a)(1).
 

 [2]
 

 . If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court’s later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59.
 

 Fed.R.Civ.P. 50(b).
 

 [3]
 

 . Said section provides that "[e]veiy person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life."
 

 [4]
 

 . 32 P.R. Laws Ann. §§ 3141-49.
 

 [5]
 

 .Puerto Rico’s general tort statute is codified in 31 P.R. Laws Ann. § 5141 and provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done.”