The **ESTATE OF José RADAMÉS TEJADA, Plaintiff**

v.

**Myrna Cartagena FLORES, Defendant.**

**Civil No. 02–1209(JAG).**

United States District Court,
D. Puerto Rico.

Jan. 21, 2009.

Ramon L. Garay–Medina, Garay Medina Law Office, San Juan, PR, for Plaintiff.

Yahaida Zabala, Law Office, Carolina, PR, Charles E. Vilaro–Valderrabano, Cancio, Covas & Santiago, LLP, Harold A. Frye–Maldonado, Iris Alicia Martinez–Juarbe, Monica A. Sanchez–Rivera, P.R. Department of Justice, San Juan, PR, for Defendant.

## OPINION AND ORDER ON MOTION FOR NEW TRIAL

JUSTO ARENAS, United States Chief Magistrate Judge.

### FACTUAL AND PROCEDURAL BACKGROUND

The original complaint in this case was filed on February 11, 2002. (Docket No. 1.) The case was tried to a jury from September 8 through 12, 2008. The jury returned a verdict in favor of the defendant on September 12, 2008. (Docket No. 188.) On September 25, 2008, plaintiff filed a timely motion for new trial under Rules 59, 60 and 61, Federal Rules of Civil Procedure. (Docket No. 189.) Plaintiff presents a seven-prong challenge to the verdict. The motion was opposed on October 23, 2008. (Docket No. 192.) I will address those challenges *seriatim* but because the plaintiff alleges as a threshold challenge that the verdict is contrary to the weight of the evidence, I review the evidence as presented at trial.

Plaintiff is the estate of José Radamés Tejada Batista. The one member of the estate is the decedent's mother, Idalia del Carmen Tejada. The body of José Radamés Tejada Batista, which contained a bullet wound from a 9mm shell, was found on April 14, 1997 in a rooftop shed he used as his living quarters located above the second floor of a building in a public housing project. The discovery occurred on the day after the police conducted a high speed chase in the street below those quarters. Police officer Myrna Cartagena–Flores was one of the many police officers who appeared on the scene in the early morning hours of April 14, 1997. A

ballistics expert's report determined that the bullet found in Mr. Tejada's body carried some characteristics of another bullet which came from Officer Cartagena–Flores' weapon.

Sergio Gazmei, 55 years old, a neighbor of both Idalia del Carmen Tejada and the decedent, testified that he has lived on Castuera Street, Embalse 355, San José, Río Piedras, since 1987 and currently works for the State Elections Commission (Comisión Estatal de Elecciones) as an internal security agent. He knows Idalia del Carmen Tejada who lives on Ceuta Street which is next to Castuera Street. He also knew José Radamés Tejada Batista, who was the son of Idalia del Carmen Tejada, and would see the decedent almost every day. The decedent worked with the municipality of San Juan picking up trash as a crew member of a garbage truck. Mr. Tejada lived on a rooftop. His landlord was Felipe Román Rodríguez.

In the early morning hours of April 14, 1997, Mr. Gazmei was lying down at about 1:30 a.m. when he heard sirens far away, getting closer. He then heard the strong sound of a car crash, and then heard the sounds of shooting right after that. First he sat up, grabbed his wife and daughter and put them on the floor. Then his wife, daughter and he went running out of the house. Mr. Gazmei heard someone utter "Ay. Ay. Ay. I've been injured." The sirens were silent by then. Once outside he looked to his left and saw police officers dressed in black and in military formation. Mr. Gazmei heard people talking, and complaining. A car had hit a fence and remained there. Officers wearing black uniforms (from the Police Saturation Division) had gone into the alley and came out with someone under arrest. Mr. Gazmei did not know if the arrested person had a weapon. There was a police patrol car present, and a Puerto Rico National Guard vehicle as well as a helicopter hovering over the building. Mr. Gazmei saw some police officers bending over as though to pick something up. The officers were carrying weapons. Mr. Gazmei remained on the scene until 2:15 A.M.

In relation to the shots fired, Mr. Gazmei testified that there were five or six shots. Mr. Gazmei lived about 10 or 20 feet from the victim's house and had last seen the victim on the 13th at 11:15 P.M. since the victim had been washing Mr. Gazmei's wife's car. He next saw him already dead at the place where he lived. During the daylight, on the morning hours of the 14th, as Mr. Gazmei swept the street like he always does, he picked up a bullet from the ground. He then called for Radamés after finding the bullet, although he was not worried about Radamés. He took the bullet, put it in his pocket and forgot about it. He showed it to a neighbor and later he put it in his drawer at home. He then went to work. When he returned from work he asked a neighbor, Rafi Laboy, about Radamés. The neighbor said he had not seen him. Rafi Laboy went to the door of Radamés Tejada, noted that Radamés' television was on, and felt he should be in there. There was a shovel at the door and he pushed it to the side and started screaming, "He's dead. He's dead." Mr. Gazmei noted that Radamés had swollen arms and eyes half open. He was red and swollen from the sun. Mr. Gazmei then called the police, and informed them that Radamés was dead. The police arrived and escorted the people at the scene away from the place. This all occurred at about 5:00 P.M. of April 14.

Later, after the wake at the home of Radamés' mother, two policemen came looking for Mr. Gazmei, and asked him for his name.

Before the death of Radamés, Mr. Gazmei would see the decedent every single day. The decedent lived in a zinc or tin roofed open structure. Under that structure, the deceased had a bed and a television. The structure had no concrete walls.

Mr. Gazmei was interviewed by news reporters but was never summoned by the police. While agents went by during the wake, he did not remember being told by an officer Miguel Caraballo to go by his office. He testified that at very least, he was not given a formal summons or anything like that. Mr. Gazmei gave the bullet to attorney Santini. He did not give the bullet to the authorities because he wanted the press to know what had happened. According to him, the officers had been talking among themselves, about the decedent and the prosecution of a delinquent, and that there had been no exchange of gunfire.

Idalia del Carmen Tejada, mother of the decedent, testified that she lives on Ceuta Street, Embalse San José. She is 68 years old, was born in the Dominican Republic, and has lived in Puerto Rico since 1965. She does not work although she worked in a family home at one time and receives social security benefits. Mrs. Tejada said that her son arrived in Puerto Rico when he was 10 years old, and lived with her. He studied until the eighth grade. The decedent was the oldest of her five children and had to work because her husband was left handicapped. In 1997, her son worked with the municipality of San Juan for which he had worked for eight or nine years, cleaning sanitation trucks.

At one point, the decedent left her house and went to live at the home of Felipe Román at 351 Castuera Street and began doing contracting, carpentry and masonry. Mrs. Tejada could stand and look through her bathroom window and see where her son lived. He would help her when he got paid, and helped her with food and household things. She would see him every day and he was always paying attention to her. Her son wanted privacy; he was 35 years old.

Mrs. Tejada testified that on April 13, 1997, her son was alive washing his car. On April 14, at either midnight or 1:00 A.M., she heard sirens and shots fired from a patrol car. She threw herself on the floor and hoped nothing would happen to her children. Her daughter was with her and said to her "mom, don't get up. There are too many cops!", meaning there were too many patrol cars. Mrs. Tejada calmed down a bit while her daughter opened a window. She testified that there were police officers everywhere, too many police officers; cars were parked irregularly. The police department Humvee vehicle was there. Saturation Division police were also there. Officers were squatting. She heard three or four shots. Policemen were chasing young men, while shooting in the street. There were also police officers with weapons, long machine guns, and many undercover police officers. Everyone with the government was armed. The pursued young men were arrested and handcuffed. They were later released because of lack of evidence in the possession of the police. People were walking around crazy. Someone yelled that someone else had said "Help me; I've been hit". It seemed that someone had been injured. Nobody then knew that it was her very own son.

Mrs. Tejada recalled that on April 15, Felipe Román came by and she said to him that the decedent was up there sleeping. Mrs. Tejada went to work that morning. People were looking for her son. While she was at work, her daughter came to get her. While in her daughter's car, her daughter gave her pills, making her wonder why she was being drugged. When

she asked what was happening, her son-in-law told her that one of her sons had been found dead. She asked which one and her son-in-law told her it was Radamés. Rescuers had brought him down from his living area. She did not see him on that day but identified him at the Institute of Forensic Science. His body was black. The sun had burned him black. He was dark-skinned, like being cooked by the sun. She could barely recognize him. She received the body on the 16th.

Mrs. Tejada testified that she was not interviewed by Second Lieutenant Caraballo at the Institute for Forensic Science, and that she had no reason to tell him anything. She denied telling the lieutenant that she had thrown Radamés out of the house because he abused her and used drugs. She said it was a lie. Mrs. Tejada noted that her son lived under a zinc roof, above a second floor, and that he liked to live like an Indian. He had told her that he wanted to die like an Indian. She said she did not know if he used drugs.

On the night of the incident, Mrs. Tejada's daughter opened the window to the bedroom from which one can see the street. She saw many policemen, and saw them following three young men. The police had dismounted and were running and shooting in the air. Mrs. Tejada herself did not see this (the homes are next to each other). There were lots of cars, people running, police shooting, cops bending down behind a door. She herself did not see the police get out of any car, and did not see them shooting in the air, although she heard shots before looking out the window. She did not see who fired the shots. She does not know Myrna Cartagena. They opened a window about half way

about five minutes after the shooting stopped. She and her daughter went out to the balcony about 10 minutes after the shots were fired.[1] They actually did not go out to the street but rather to the balcony where they stayed. The reason she knows shots were fired in the air was that people, neighbors, were saying that "they grabbed the guys, they grabbed the guys." She did not see the police shooting and once on the balcony, did not hear anyone saying "someone got shot." She knew that Sergio Gazmei lived close to her son and that Radamés had called Sergio Gazmei to say he had been shot. He yelled, "Sergio, ayudame!" or "Sergio, help me." Sergio Gazmei said he had heard that and looked around, everyone looked around, everything was closed by the police and no one could return to offer help. The men that were being chased by the police heard the same plea and were telling the same story because they could not come back because the police were shooting at them. The men that the police were chasing told this to other people. Mrs. Tejada learned this from Sergio Gazmei on the day following the burial. Sergio Gazmei did not know that it was her son, that he had been killed. Sergio Gazmei had heard "Help me. I'm hit!", but had not recognized her son's voice. No one at Forensics had to tell her how long his body had been exposed. She knew because the shots were fired between 12:30 A.M. and 1:00 A.M. Mrs. Tejada denied that in her area shots were fired either every day or every week. She said it was a calm area.

She recalled signing some papers on August 10, 1998 under oath and was given the bullet before that. She had hired some attorneys and they received the bul-

---

1. Mrs. Tejada was questioned in relation to prior testimony when she was thrown on the floor and was there about 10 or 15 minutes and then her daughter helped her up, but she delayed because of her nervousness. The time before going outside and hearing the shots was more like five minutes.

let. Sergio Gazmei had given her the shell about a week after the shooting, more or less. He said he had found it while sweeping the alley where he lived. She did not give the shell to the lieutenant but he knew she had it. She thought it was from a weapon and she wanted to investigate the death of her son. The police were always after her to give them the evidence, and she was not going to hand them the evidence because they were not going to investigate the death of her son in depth. She needed the shell for her lawyer who was going to clear up the death of her son. Thus she gave the shell to attorney Santini. She said that she had heard more shooting, and that Myrna Cartagena's gun had killed her son, because the investigation showed that the shot came from her gun. Mrs. Tejada had never seen Myrna Cartagena before the day of trial, although she recalled that she saw her at a deposition.

Brenda Pla Díaz, a police forensic investigator, testified that she issued a report, Joint Exhibit I, regarding the death of the decedent. She related the facts in the report, that the decedent was found in a rural sector in a building on a third floor (the roof of a second floor), in a face-up position. The body exhibited rigidity, and had black and blue marks.

Captain Samuel Vilella Pagán of the Police of Puerto Rico, is currently the subdirector of the C.I.C. (Puerto Rico's equivalent to the F.B.I.). He testified that in 1997, he was at the Puerto Nuevo precinct, and was a first lieutenant, and assistant commander for administration and operation. He noted his signature on Exhibit 1, which is a report of an investigator dated June 2, 2000. The investigation was conducted because of a possible lawsuit due to police negligence based upon an event occurring on April 14, 1997. The police had

received a letter from an attorney. Captain Vilella explained there were different ways of approaching the investigation. He had to see if members of the force were involved. He determined that the incident subject of the investigation took place in the Embalse San José. There were police doing something there at that time-they were attempting to arrest someone. Captain Vilella interviewed Sergeant Miguel A. Caraballo Villalongo, Officer Luis Cruz Andaluz, Officer Javier Ríos, Officer Andy Montáñez, Sergeant José Febo Arvelo, and Officer Myrna Cartagena Flores, and sworn statements were taken of these officers. None were taken of Myrna Cartagena, however, who exercised her right not to testify, as she said in her statement. The others were read their rights and gave statements of their own knowledge. Captain Vilella was the one who determined whom to interview. All of the above officers had some participation in the event. The weapons of the agents at the scene were tested.

Captain Vilella testified that according to the report, and based upon a confidential tip, some suspicious people were going to the Manuel A. Peréz Public Housing Project precinct to steal a particular vehicle. The suspicious people were driving in a vehicle whose description was given. The officers chased that vehicle, which had been reported as "disappeared." The suspicious people crashed the vehicle and ran away. Those people were not described. The vehicle itself had been described as a green Hyundai with three heavily armed individuals. Saturation [2] Agents Andy Montáñez, Luis Cruz Andaluz, Samuel Feliciano, and Javier Ríos were involved. A 10–50 police code seeking support had gone out. Thus support police personnel

---

**2.** The new name for Saturation is the Special Operations Division.

went to the trouble spot from different precincts.

As part of the investigation, pistols were tested. According to the ballistics report of the weapon carried by Myrna Cartagena, there was not sufficient information to reach a final conclusion.

Captain Vilella explained that he is an administrative investigator, and that he is not a homicide investigator, and could not conclude that Agent Cartagena's weapon was the one that caused the death. None of the police that intervened there fired their weapons, at least that he was informed of. There were more policemen than weapons tested. The conclusion was that plaintiff had not established administrative responsibility. Captain Vilella said he did not receive any photographs and did not consider a video taken at the scene and considered them not pertinent to his investigation, since they pertained to the criminal investigation. He checked only if there was negligence on the part of the agents.

He interviewed Idalia del Carmen Tejada who had said that she had seen the Saturation officers, the Puerto Rico National Guard Humvee, another car, and people running about. She had also seen a patrol car blocking the street. There were shots in the direction of where the "guys" were. During the chase, Officer Cartagena was not at the scene, and was not placed at the scene by anyone during the chase. This was his conclusion based on the ballistics report, interviews, and the entire investigation. The bullets had some common characteristics but not enough to make a conclusion. That was the conclusion of ballistics expert Aníbal González Rodríguez.

Police Officer Luis Cruz Andaluz, badge number 21177, has been a police officer since 1994.[3] He testified that he graduated from the Police Academy and went to Saturation until 2003, and then to Security and Protection. In 2005, he went to the illegal weapons division, and is now with Special Operations.

At the time of the incident, a normal day at the office began at 6:00 P.M. and ended at 2:00 A.M. Before the shift, the officers received instructions from the shift supervisor. On April 13–14, 1997, his supervisor on that shift was Lieutenant José Febo Arvelo. Others on the shift were Officers Samuel Feliciano, Javier Ríos and Andy Montáñez. From 1:00 A.M. and 2:00 A.M., Officer Cruz Andaluz was patrolling with Officer Febo Arvelo and they were about to arrive at the station house when they received a call from Hato Rey East that at the Manuel A. Pérez Public Housing Project precinct there was a seized vehicle with controlled substances inside awaiting a prosecutor's order to open it. There were threats to take the car away by some people. A suspicious car, described as a green Hyundai, had been seen around the station. The lieutenant told him to go with Officer Feliciano. Thus, Officers Feliciano, Montáñez, Ríos and himself left the station house in an official vehicle to the Sicilia Street, Hato Rey precinct, and saw an approaching vehicle, a Hyundai, with three people inside. The people in the Hyundai sloped down in the seats. The license plate on the vehicle matched the one reported to the police. The police car then made a U-turn, put on the siren and roving light and continued behind the green Hyundai. Control said that the vehicle was reported as "disappeared". The Hyundai then accelerated to flee, and went

---

3. Officer Cruz Andaluz testified on direct examination on September 9 and was cross-examined on September 11, 2008.

into the San José neighborhood. As the chased vehicle went over a bridge, a passenger in the Hyundai threw something into the lagoon. Officer Cruz Andaluz then sent a message to control and the green Hyundai crashed into a wall, where the occupants got out and ran. Officer Cruz Andaluz and Officer Montáñez got out of their car and chased the driver while the others, Officers Feliciano and Ríos, chased the other occupants to the right, running through the alley. Officers Cruz Andaluz and Montáñez never lost sight of their suspect and chased him under a house, where he was then arrested. Back up arrived after the suspect was controlled. There was also a helicopter as backup. The officers then went back to where the vehicle had stopped. The officers then left to make the reports. The car pursuit lasted maybe five to seven minutes and the foot pursuit maybe five minutes. Officers from the Hato Rey East, and Barrio Obrero precincts also arrived.

On the following day, Officer Cruz Andaluz continued the investigation. He went home and was called in the evening by Lieutenant Febo that he was to come to work urgently. He looked at the television. The Channel 11 anchor woman said a dead person had been found in San José, and that there had been a shoot-out. He got worried because no shots were fired so he called the captain and a lawyer who told him not to go in. On the following day, he went to the C.I.C. in San Juan. All personnel from Saturation that worked on the night of the incident were summoned. An investigator said that they were being investigated because of a dead person. All of their weapons were seized. He unloaded his weapon and gave it to the investigator, including five shells and a magazine. There were no results against him. He did not use his firearm and did not remember seeing officer Myrna Cartagena on that night.

Police officer Samuel Feliciano Figueroa testified that he has been a policeman since 1996. He graduated from the academy in 1997 and had been with Saturation until 2000 when it became the Special Operations Division. He has been at the Hato Rey East precinct for one and a half years. In 1997, he was at Saturation, San Juan Division. On April 13–14, 1997, his supervisor was Lieutenant Febo and also on duty from 6:00 P.M. to 2:00 A.M. were Officers Luis Cruz Andaluz, Andy Montáñez, Javier Ríos, Rafael Gómez Águila and Myrna Cartagena. As he returned to the precinct, Feliciano Figueroa was told to go to the Manuel A. Pérez Public Housing Project precinct because there was a vehicle with people who were heavily armed around the area trying to get into the police station to remove drugs and weapons that had been seized. Therefore, he got into an official vehicle with Officers Andy Montáñez, Luis Cruz Andaluz, and Javier Ríos and went to the Embalse San José to try to find the vehicle. Officer Cruz Andaluz was the driver. They then saw the vehicle coming toward them and commanded it to halt. It paid no attention and the police vehicle then pursued it through the street, with siren and roving light on. The pursuit ended when the pursued vehicle crashed against the wall of a residence and the occupants got out and ran in different directions. Officers Javier Ríos and Feliciano Figueroa went running toward the right and through the alley. They did not draw their weapons. It was practically dark. After three to five minutes on foot, two officers from the precinct arrived and brought them the pursued person. Javier Ríos handcuffed him and brought him back to the patrol car. The car chase lasted one to two minutes. The officers returned to the patrol car and officer Rafael Gómez Águila had just got-

ten there. Officer Gómez Águila gave officer Feliciano the keys to the patrol car since they had been dropped. Many police officers arrived in different cars.

The officers were all summoned on the 14th in relation to a dead person. They were under investigation. Officer Feliciano Figueroa described that the procedure to be followed once a firearm is used includes notification to one's supervisor. No report was filed because no weapon was used. No shots were fired either during the car chase or the foot chase. He never saw officer Myrna Cartagena that night. No suspect taken into custody had possession of a weapon. Nobody requested Feliciano Figueroa's weapon and nobody counted his bullets because they were not used. The weapon was surrendered on March 8, 1999 and was never returned to him. That was the first time he met Captain Samuel Virella Pagán. Aside from the statement, he made no reports. Officer Feliciano Figueroa had carried a shotgun with him on the evening of the incident.

Lieutenant José Febo Arvelo testified that he has been a police officer since January 2, 1986. He graduated from the Police Academy on May 29, 1986. He began working for the Police Athletic League in Bayamón and became a sergeant in 1992. From the League, he was assigned to the Saturation Division in Santurce in 1994 and in 1999 he was assigned to the Tactical Operation Division of San Juan where he remained until 2003. From then to the present, he has worked at the Division of the Weapons Depository. In 1997, he was a sergeant and his daily task was to supervise personnel who would impact the drug distribution points. On the evening of April 13–14, he was working the 6:00 P.M. to 2:00 A.M. shift. He recalled those working on that shift: Officers Myrna Cartagena, Luis Cruz Andaluz, Rafael

Gómez Águila, Javier Ríos, Curbelo and Lieutenant Febus. He did not remember anyone else. Between 1:00 A.M. and 2:00 A.M., he was drafting reports related to the day's interventions, arrests and drug seizures. Officer Cruz Andaluz was his assistant. He received information from officer Cruz Andaluz, who had received a call, that they had to "verify" a Hyundai with armed individuals inside. Five to ten minutes later the officers left the police station courtyard. Upon arrival at the end of the chase scene, they found a lot of police units together from different precincts, maybe 50 to 60 people. People had already been arrested. At the scene, he saw officers Feliciano Figueroa, Cruz Andaluz, Gómez Águila, Javier Ríos and Myrna Cartagena. He took control, looked at the canal where evidence had been thrown, and later filed a report (Joint Exhibit IV). Gunshots had been mentioned but since none were fired that night, none were reported. Later that day, he was home when he received a phone call to come down to the division, because the officers were being investigated due to a death. His weapon was seized. He was told they had found a person dead in San José.

Police officer Rafael Gómez Águila testified regarding his shift. He was patrolling in a car with Officers Myrna Cartagena and Curbelo. Patrolling in another car were Javier Ríos, Andy Montáñez, Samuel Feliciano Figueroa and Luis Cruz Andaluz. Officers Gomez Águila, Curbelo and Cartagena were returning to the station between 1:30 A.M. and 2:00 A.M. At the station, they had taken off their vests and were handing the car keys in when they received a call about a Hyundai. Officer Gomez Águila told officer Myrna Cartagena and others to put on their vests and that they were going out. Another call was received that the police were in pursuit at San José Embalse where Officer Gomez Águila lives. He is thus familiar

with those streets. The other officers had radioed that the Hyundai had impacted a wall at Ceuta Street and that there was a pursuit on foot. Officer Gómez Águila got to the end of the street where Ceuta Street creates a fork with Calzada Street, where he lives. They found a police car with doors open, the revolving light on, and the siren also on. There were no policemen present. They turned off the police car engine, light and siren and checked the crashed car. Then other cars came from everywhere. A military Humvee arrived. Officer Gómez Águila turned over the car keys to a colleague and then went to the stream where the object had been thrown, together with Officer Myrna Cartagena and Officer Curbelo. They could not find anything. From the moment he received the radio call regarding the impact of the Hyundai to the arrival of their police car about three minutes elapsed. Officer Myrna Cartagena was in the back of the patrol car and upon arrival at the scene. She never fired her weapon.

Officer Gómez Águila was later summoned by the Homicide Division regarding the death of a neighbor of his at Calzada Street and Ceuta Street. He was interviewed but his weapon was not seized because it was a .357. No one discharged a weapon. He did not pass by Castuera Street.

Retired Captain Miguel A. Caraballo Villalongo testified that he retired from the police after 30 years of service in March 2007. In 1997 he was a sergeant and supervisor in the Homicide Division of San Juan. His supervisor would assign cases to him if a member of the police force was involved. He would go to the field and interview agents, forensic technicians, and witnesses in the area. Joint Exhibit V was a report showing the first steps taken. He was assigned the investigation on April 15, 1997. He went to the

Forensic Sciences Institute, interviewed the mother and brother of the decedent, and the forensic pathologist. The decedent's mother said she had thrown the decedent out of the house because of drug abuse.

The forensic pathologist findings revealed the shot entered the left arm and the left side, ascending from left to right. Twenty-four to thirty-six hours had elapsed from the moment of death and the body had begun to decompose. Captain Caraballo had been at the scene and knew where the events occurred. He also went to Hato Rey East police station and asked for the service logs. He also went to the Guayama and Francia Street precincts and asked for the service logs. He copied the logs where the agents signed in and out. None of them were working on April 15, 1997. He then summoned seven to nine agents and interviewed them in relation to the chase. He collected all of the weapons that were 9mm., each magazine and five bullets, and took them to the Forensic Sciences Institute. He then returned to interview the landlord of the deceased. The landlord said he had heard the impact, the siren of a car, running steps in the alleyway, and he also heard some gunshots. He said he heard moans but paid them no mind. Sergeant Caraballo spoke to the decedent's mother and asked her about the incident. She said her son had lived with her but she threw him out, since he had mistreated her and was a drug addict. She had last seen him a week before the events. He received the results of the ballistics tests from forensics and found them to be inconclusive.

Officer Myrna Cartagena testified that she has been a police officer since October 12, 1995 and graduated from the Police Academy on March 24, 1997. On April 14, 1997, at about 30 minutes before her 6:00 P.M. to 2:00 A.M. shift ended, she was on

patrol with other agents when they heard on the radio that a suspicious vehicle was going to Manuel A. Pérez Public Housing Project. Officer Gómez Águila said "let's go and support our colleagues" because Officer Javier Ríos said he had located the vehicle and when they were on the way, Officer Ríos called again and said they were in pursuit of the vehicle which was located 10 to 15 feet from where Officer Gómez Águila's mother lives. Thus, he is familiar with the location. At the location, he found a crashed vehicle and a patrol car four feet away with its doors open, but nobody was inside. When they arrived on the scene, there were about 10 people at the scene who were not policemen but immediately, many units arrived. Soon the place was full of policemen as well as people who live in the area. She and Officer Javier Ríos stayed in the area. She heard that controlled substances had been thrown into the mangrove.[4] Officer Gómez Águila said, "Lets go look for the substances." Cartagena checked to see if someone was in the crashed vehicle. She then left to check in the mangrove. They then left the scene and returned to the precinct. She went home but was called later in the day to the C.I.C. office on 65th Infantry Road because a dead person had been found. She was interviewed by Sergeant Caraballo and told him about the chase. She turned in her weapon, bullets and clip. She has never used her service weapon. It was the only time she was interviewed by Sergeant Caraballo. On March 8, 2000, Lieutenant Vilella called her in relation to an administrative investigation regarding negligence at the Embalse San José, and regarding a complaint made by Idalia Tejada. On the recommendation of her attorney, she was not interviewed. She chose not to make a

statement. When the acts occurred, she had been in the Saturation unit for 20 days.

Upon the officers' arrival at the scene, Officer Cartagena said she was not concerned with the safety of the other officers. Their own car did not have the siren on, just the light on top. When she was interviewed by Lieutenant Vilella, she did not know the results of the ballistics test. The weapons from her unit were the ones seized. She did not know what type of bullets she had in her weapon although she said that all the bullets have a hole in the center. She said that there was no need to unholster her weapon on the evening of the events.

Juan B. Maldonado, firearms expert, testified outside the presence of the jury. Fed.Rules Evid.Rule 104(a). He testified that he received the bullet and firearm for inspection in order to make a report. The analysis was performed on November 6, 2005. The bullet he received was in the evidence room of the Institute of Forensic Science, and before that the bullet was in the possession of the C.I.C. There is a laboratory number on both documents, a control number from the firearms section – AF–97–633. Both have the same number, the same number in the complaint, case number, and Police of Puerto Rico complaint number.

Referring to I.d. B, he noted it was a pistol and fired projectile. The pistol has the serial number and barrel length, and was marked by C.I.C. Agent Vicente Class Corchado had submitted it.

On cross-examination, Mr. Maldonado testified that he did not know where the bullet was between 1999 and 2005, and

---

4. The mangrove spot is previously referred to as canal and stream. All refer to the same location.

does not know where it was taken to. The bullet was measured and weighed and had the initials AGR on projectile. It was weighed and examined as part of quality control.

Mr. Maldonado was not allowed to testify at trial on behalf of the defendant.

### A. Weight of the Evidence

 In reviewing the evidence on a motion for new trial, I consider such evidence in the light most favorable to the verdict.

A verdict should only be set aside if the evidence at trial was so strongly and overwhelmingly inconsistent with the verdict that no reasonable jury could have returned it. *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 393 (1st Cir.2002). It has also been stated that "[o]nce a jury returns a verdict, a 'heavy burden' is placed on one who challenges it." *White v. New Hampshire Dep't of Corr.*, 221 F.3d 254, 259 (1st Cir.2000). A verdict must be upheld unless the evidence presented supports only one conclusion; that the verdict cannot stand. *See Walton v. Nalco Chem. Co.*, 272 F.3d 13, 18 (1st Cir.2001). When reviewing the evidence, all inferences must be drawn in favor of the nonmoving party. *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 75 (1st Cir.2001).

A new trial, on the other hand, should be granted and the verdict set aside if the trial judge "is of the opinion that the verdict is against the clear weight of the evidence," and that a miscarriage of justice will occur if the verdict is allowed to stand. *Sheils Title Co. v. Commonwealth Land Title Ins. Co.*, 184 F.3d 10, 19 (1st Cir.1999).

*Torres v. Kmart Corp.*, 233 F.Supp.2d 273, 277 (D.P.R.2002).

If from the evidence presented at trial, fair minded persons could draw different inferences, then the matter is for the jury to resolve and judgment as a matter of law is not appropriate. *Espada v. Lugo*, 312 F.3d 1, 2 (1st Cir.2002)., But the non-moving party must have presented " 'more than a mere scintilla' of evidence" to survive a motion for judgment as a matter of law and cannot rely on "conjecture or speculation." *Katz v. City Metal Co.*, 87 F.3d [26,] 28 [ (1st Cir.1996) ] (quoting *Richmond Steel, Inc. v. P.R. Am. Ins. Co.*, 954 F.2d [19,] 22 [ (1st Cir.1992) ] ).

*Gónzalez Pérez v. Gomez Águila*, 312 F.Supp.2d 161, 164 (D.P.R.2004).

 While the non-moving party has presented more than a scintilla of evidence, in order to vacate the jury verdict, I would have to indulge in speculation and guesswork, and also have to decide that a miscarriage of justice has occurred. Among the reasons supporting the verdict was the jury's making credibility determinations in favor of the defendant. Plaintiff's version of the facts relies on shots being fired and one particular shot being fired from the defendant's service weapon. A competing version as supported by the testimonies of the police officers is that no shots were fired that evening, and yet another version is that by the time Myrna Cartagena arrived at the scenes, all of the shots that were fired had already been fired. Then again, the jury might have decided that the bullet did come from the defendant's weapon but that her actions were neither intentional nor reckless. If the bullet in the decedent had some characteristics of a bullet from officer Cartagena's weapon, expert information was yet inconclusive in identifying the source of the bullet inside the victim. How the bullet was lodged in the victim lends itself to speculation but there is more than one feasible explanation. If there were not,

then plaintiff would be entitled to a new trial.

The verdict was not against the clear weight of the evidence. The parties' versions were at loggerheads and the jury was required to determine which version to believe. If they believed that shots were fired at all, they would almost surely have to have decided in favor of plaintiff since it would shock the conscience to have the defense support its case with perjured testimony, including that of the defendant, in relation to the issue of whether shots were fired or not. The jury could have disbelieved the version that three or four, or five or six shots were fired right after the car chase or during the pursuit on foot. The jury could also have believed the testimony of the police officers that no shots were fired, and that no weapons were unholstered because there was no need for the same. Therefore, the verdict is clearly supported by the evidence.

## B. PREJUDICIAL STATEMENTS ON OPENING STATEMENT AND CLOSING ARGUMENT

Defense counsel peppered his opening statement with argument from beginning to end, and also vouched for defense witnesses, defending the defendant's reputation and referring to her monetary resources. Plaintiff objected and I explained to the jury that there was one defendant, not any other person nor the Police Department on trial. Defense counsel was also admonished to stop arguing the case on opening statement, and an instruction was given to the jury describing the difference between opening statement and closing argument, as well as emphasizing that neither was evidence and sometimes things are said that are not proven. No more precise curative instruction was given. No statements were stricken. Plaintiff's counsel was diligent in objecting, and aside

from the action taken, no further remedy was sought at the time. Indeed, beyond instructing the jury that opening statement is not evidence, no other curative instruction was given or suggested, beyond the admonishments to defense counsel regarding argument.

During closing argument for the defense, there were several objections to comments on the evidence. Defense counsel referred to the fact that only Mr. Gazmei was able to mention the bullet shell and did not produce the shell, thus questioning not only the existence of the evidence, but also placing doubts on the testimony of Mr. Gazmei. Plaintiff's counsel objected. I did not give a specific instruction to the jury about the bullet but gave the jury a general curative instruction that the jury's recollection is what matters, an instruction similar to the one given at the beginning of the trial and also in the final instructions after argument.

The defense argued on closing that the only person on trial was Myrna Cartagena, and plaintiff objected. I said there would be an instruction. Defense counsel stressed at argument that Mr. Gazmei found a bullet shell the next day and kept it. Mr. Gazmei claimed that he had evidence, but never presented it. Counsel argued that the shell might have been pretty useful. Over objection from plaintiff, I instructed defense counsel to continue. Defense counsel continued to argue that Mr. Gazmei did not care about giving the bullet to authorities and said he had given it to the lawyer. The decedent's mother said it was given to their lawyer for investigation. In 1998, Mr. Gazmei was summoned to appear at an administrative investigation conducted by Captain Samuel Vilella based on a letter saying that "they" were going to sue. The claim was mentioned to the jury by defense counsel. Closing argument also stressed

that Officer Cartagena was never at the scene.

Plaintiff argues that she was not able to present before the jury evidence which was presented before the Commonwealth court or even the fact that there had been a civil case before the state court. At that trial, the government of Puerto Rico was found liable for negligence and judgment was entered for $75,000, the maximum allowed under Puerto Rico law. In that case, officer Myrna Cartagena was not a party and the government allowed itself to be defaulted.

## C. FAILURE TO GIVE A CURATIVE INSTRUCTION REGARDING MISSING EVIDENCE

The defense emphasized that the bullet picked up by Mr. Gazmei was not presented in evidence. Notwithstanding plaintiff's arguing that this placed in doubt the existence of the bullet, the defense argument more readily referred to the handling of the bullet, from Mr. Gazmei to the decedent's mother to an attorney for purposes of supporting a claim, indeed, that the bullet was kept in private hands for years. While plaintiff presented no adequate explanation to the jury as to where the bullet was located at the time of trial, no solution to the quandary of explaining the bullet was proposed other than to allow an explanation of the local civil action in which the local government defaulted, something it apparently in order to limit the judgment that could be rendered against it. I considered this information confusing to the jury and disallowed mention of the results of the local case and details of the same.

## D. COMMENT ON THE POVERTY OF THE DEFENDANT TO PAY A VERDICT

▮▮ During the closing argument, the defense mentioned that Officer Myrna Cartagena had to pay the verdict. While this defense argument was objected to, I overruled the objection. It is not error to allow the jury to consider the defendant's ability to satisfy the verdict, at least in relation to punitive damages. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 269, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), *cited in Acevedo–Luis v. Pagán,* 478 F.3d 35, 39 (1st Cir.2007). The mere fact that the defendant is represented by Commonwealth counsel does not mean the government will satisfy the verdict under Law 9. Law 9 simply provides the Secretary of Justice discretion to indemnify officials. *See* P.R. Laws Ann. tit. 32, § 3085; *Acevedo–Luis v. Pagán,* 478 F.3d at 39–40. Plaintiff argued that Myrna Cartagena was being represented by a government attorney. Plaintiff argues that informing the jury of Cartagena's sole personal liability was improper and misleading since if a judgment is imposed against the defendant, she may request that the Commonwealth pay the amount of the verdict. Plaintiff therefore considers the argument a low blow since it also calls upon the jury to decide an issue that is not part of the evidence. I gave the jury an instruction on punitive damages, however, which was not objected to, which informed the jury that they can consider the financial resources of the defendant in fixing the amount of punitive damages.[5] Thus, inference of ability to pay damages is subject matter for the evidentiary debate and jury deliberations. In any event, the jury could have found in favor of plaintiff and rendered a nominal amount or a comparatively small amount in a plaintiff's verdict. *See, e.g., Acevedo–Luis v. Pagán,* 478 F.3d at 40. That I did not give a more adequate instruction concerning a comment which invites sympathy, and is contrary to

5. The instruction on punitive damages was proposed by both plaintiff and defendant.

the axiom that all persons are equals in a court of law, does not result in error requiring a new trial, particularly since the comment was sufficiently isolated to diffuse its weight in deliberations.

### E. OBJECTION TO THE WORDING OF THE VERDICT FORM: PERSONALLY

■ I read and described the verdict form as part of my instructions to the jury. The first sentence of the verdict form reads: "Do you find from a preponderance of the evidence that the defendant Myrna Cartagena, under color of law, personally violated Radamés Tejada's federal constitutional rights by conducting herself intentionally and recklessly?" (Docket No. 183.) : That I allowed the word personally in the form reflects my concern that the jury would transfer responsibility for José Radamés Tejada Batista's death to the police in general, based upon one view of the evidence that reflects the police entering the chase scene guns ablaze. Furthermore, the verdict form refers to wording in the instructions that indicates that the defendant's personal involvement is a requirement for a plaintiff's verdict. *See* Instruction No. 17. Clearly the involvement of other police officers could not be transferred to the defendant for purposes of liability. Therefore, that the word "personally" was included in the verdict form neither unfairly prejudiced the plaintiff nor misled the jury in some other manner.

### F. OBJECTION TO THE VERDICT FORM'S STANDARD OF LIABILITY: INTENTIONALLY AND RECKLESSLY

The verdict form submitted to the jury required a finding that defendant acted "intentionally and recklessly" in order for defendant to be liable. (See Verdict, Docket No. 183.) Plaintiff contends that "the verdict form appears to make the burden [on] Plaintiffs even more difficult" than the actual standard. (Docket No. 189, at 23.) As an initial matter, I note that plaintiff failed to object to this aspect of the final instructions and verdict form and therefore has little room to challenge them now. I nonetheless consider this post-trial challenge for plain error. Plaintiff contends that the wording placed an extreme burden on her. I believe the opposite is true.

■ In the context of a substantive due process claim, "before a constitutional infringement occurs, state action must in and of itself be egregiously unacceptable, outrageous, or conscience-shocking." *Cruz–Erazo v. Rivera–Montáñez,* 212 F.3d 617, 622 (1st Cir.2000) (quoting *Amsden v. Morán,* 904 F.2d 748, 754 (1st Cir.1990)). The plaintiff must demonstrate truly egregious circumstances. *Hasenfus v. LaJeunesse,* 175 F.3d 68, 72 (1st Cir.1999) (citing *Rogers v. City of Little Rock,* 152 F.3d 790 (8th Cir.1998) (rape by police officer in connection with car stop); *Armstrong v. Squadrito,* 152 F.3d 564 (7th Cir.1998) (unlawful 57-day detention due to clerical error despite repeated requests to be heard in court)). This standard "provides relief where government officials have 'abused [their] power, or employed it as an instrument of oppression.'" *López–Ramos v. Municipality of Cataño,* 556 F.Supp.2d 59, 65 (D.P.R.2008) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).

■ In light of such a difficult standard to meet, it can hardly be said that the instruction requiring a finding of "intentional and reckless" conduct was unfair. If anything, the instruction was generous by comparison to the standard enunciated here. Ultimately, however, the instruction was most likely right: "conduct intended to injure in some way unjustifiable by any

government interest is the sort of official action most likely to rise to the conscience-shocking level." *López–Ramos v. Municipality of Cataño*, 556 F.Supp.2d at 65–66 (quoting *County of Sacramento v. Lewis*, 523 U.S. at 849, 118 S.Ct. 1708). Thus, plain error was not committed.

## G. FAILURE TO PROVIDE ALTERNATIVE SUBSTANTIVE DUE PROCESS LIABILITY THEORY

■ Plaintiff also argues that the jury should have been given an instruction that focused a violation of a protected property or liberty interest infringed upon by the defendant. Plaintiff points out the following:

> There are two theories under which a plaintiff may bring a substantive due process claim. Under the first, a plaintiff must demonstrate a deprivation of an identified liberty or property interest protected by the Fourteenth Amendment. Under the second, a plaintiff is not required to prove the deprivation of a specific liberty or property interest, but, rather, he must prove that the state's conduct 'shocks the conscience.'

*Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 531 (1st Cir.1995) (citations omitted). Plaintiff argues that if Officer Cartagena never had the intention to cause harm to the decedent, then the "identified liberty or property interest" instruction would have given "the jury the oportunity [sic] to provide Plaintiffs with a remedy, because the burden is not so difficult to comply with." (Docket No. 189, at 23.) While plaintiff's theory might have some theoretical basis in the abstract, it falls apart under the scrutiny of more closely analogous (and more recent) case law:

> [Plaintiff] is in error when it posits that it can prevail on its substantive due process claim either by showing that [defendant's] conduct was conscience-shocking or by showing that her conduct deprived it of a protected liberty or property interest. This disjunctive proposition is incorrect. Where, as here, a plaintiff's substantive due process claim challenges the specific acts of a state officer, the plaintiff must show both that the acts were so egregious as to shock the conscience and that they deprived him of a protected interest in life, liberty, or property. *See Rivera v. Rhode Island*, 402 F.3d 27, 34 (1st Cir. 2005) (stating that "[i]t is not enough to claim the governmental action shocked the conscience" but that a plaintiff must also show a deprivation of a protected interest). Consequently, "conscience-shocking conduct is an indispensable element of a substantive due process challenge to executive action." *DePoutot v. Raffaelly*, 424 F.3d 112, 118 n. 4 (1st Cir.2005).

*Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir.2006). Thus, Pagán makes it clear that both deprivation of a liberty or property interest and conscience-shocking behavior are necessary.[6]

■ Even if I indulge plaintiff's argument and inquire into the fundamental rights element, the outcome remains the same. The Supreme Court includes as fundamental those rights listed in the Bill of Rights, as well as certain unenumerated rights, such as the right to privacy. *Fournier v. Reardon*, 160 F.3d 754, 758 (1st

---

6. The substantive due process elements are well discussed in circuit case law. *See, e.g., Pagán v. Calderón*, 448 F.3d at 32; *Rivera v. Rhode Island*, 402 F.3d at 34; *López–Ramos v. Municipality of Cataño*, 556 F.Supp.2d at 65, and those requiring one of the two, *e.g., Brown v. Hot, Sexy & Safer Prods.*, 68 F.3d at 531; *Pittsley v. Warish*, 927 F.2d, 3, 6 (1st Cir.1991); *Cartagena v. Calderón*, 150 F.Supp.2d 338, 343 (D.P.R.2001).

Cir.1998). "While the Supreme Court has extended substantive due process protection to certain unenumerated rights, it has not extended Fourteenth Amendment coverage to many areas." *Id.* "Tort law is one such area that remains largely outside substantive due process jurisprudence." *Id.* (quoting *Skinner v. City of Miami,* 62 F.3d 344, 346 (11th Cir.1995)). A substantive due process claim is limited in scope. Otherwise, the lesser standard proposed by plaintiff equates itself under these circumstances to a negligence standard. Clearly, the substantive due process guarantee does not serve as a means of constitutionalizing tort law so as to "impos[e] liability whenever someone cloaked with state authority causes harm." *Pagán v. Calderón,* 448 F.3d at 32 (quoting *County of Sacramento v. Lewis,* 523 U.S. at 848, 118 S.Ct. 1708).

Even if some lesser standard were to have been given, the verdict reflects the jury's collective belief that the evidence still did not prove that the police fired any shots, let alone that Myrna Cartagena fired the fatal shot. The argument plaintiff presented during trial and in the motion for new trial does not depend on the development of additional facts not heard at trial since all of the state action related to the substantive due process claim occurred on the morning of the police actions described above.

■■■ It is clear that "there is no requirement that the trial court instruct the jury in the precise form and language requested." *Hiraldo–Cancel v. Aponte,* 925 F.2d 10, 13 (1st Cir.1991) (quoting *United States v. Passos–Paternina,* 918 F.2d 979, 984 (1st Cir.1990)). I believe that the instructions on the substantive law adequately reflects the law applicable to the controlling issues without risking confusion or the possibility of misleading the jury. *See O'Connor v. Huard,* 117 F.3d 12, 16

(1st Cir.1997); *United States v. Fulmer,* 108 F.3d 1486, 1494 (1st Cir.1997). Indeed, the verdict form favored plaintiff more than if it would have contained the heightened Fourteen Amendment "shock the conscience" standard. Under the circumstances of this case, where the police action was not directed to this decedent, that he may have been deprived of his life by police action is insufficient to sustain a verdict under the substantive due process clause. *See, e.g., County of Sacramento v. Lewis,* 523 U.S. at 848–49, 118 S.Ct. 1708. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849, 118 S.Ct. 1708. The verdict reflects that such conduct did not occur here.

Before the jury left without the jury instructions marked for identification or the verdict form, plaintiff asked for a clarification. Plaintiff clarified for the record that the verdict form had a problem with the name of the decedent. I asked the parties if there was any objection to the charge or the verdict form. There was no objection to the charge or the verdict form. The instructions were marked for identification and sent to the jury with no objection from the parties and the exhibits were then sent to the jury. The defendant did not lodge a timely objection to the jury instructions. Notwithstanding objections made during the in-chambers charging conference, objections to the charge had to be made at very least before the jury left the courtroom to deliberate and immediately after they were given, or as in this case, before the jury was furnished with its exhibits so that it could initiate deliberations. *See, e.g.,* Fed.R.Civ.P. Rule 51(c)(1); *Gómez v. Rivera Rodríguez,* 344 F.3d 103, 118 (1st Cir.2003); *López–Sánchez v. Vergara–Agostini,* 419 F.Supp.2d 78, 89 (D.P.R.2006).

## CONCLUSION

This was a hard fought case. Ultimately, the verdict reflects that between two competing versions of the facts, the jury could believe one of them only. They resolved the well-defined credibility issues in favor of the defendant. Therefore the motion for new trial is denied.